NO. 22-3031

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

_____

TRACIE E. FRANK,

Plaintiff-Appellant,

v.

HEARTLAND REHABILITATION HOSPITAL, LLC

Defendant-Appellee.

_____

**APPELLANT'S MAIN BRIEF**

_____

Appeal from the United States District Court for the District of Kansas
(Civil No. 2:20-CV-002496-HLT)
The Honorable Holly L. Teeter
United States District Judge

BALDWIN & VERNON
By: s/Mark A. Buchanan
Of Counsel
108 South Pleasant Street
Independence, MO 64050
Tel: (816) 510-1532
(816) 842-1104 (facsimile)
mark@markbuchananlaw.com

Attorneys for Appellant

ORAL ARGUMENT REQUESTED

## **TABLE OF CONTENTS**

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  I

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

STATEMENT OF RELATED CASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  vi

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . . .  2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

      I.     RELEVANT PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . .  3

      II.    RULING PRESENTED FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . .  5

      III.   MATERIAL EVIDENTIARY FACTS . . . . . . . . . . . . . . . . . . . . . . . .  6

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

ARGUMENT & AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

I.     The District Court Erred in Granting Summary Judgment on Ms. Frank's
Claim for a Hostile Work Environment . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

II.    Heartland Was Negligent in Failing to Adequately Respond to Robinson's
Harassment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39

III.   Genuine Disputes of Material Fact Exist Regarding Ms. Frank's Claim for
Retaliation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  54

      A.    Ms. Frank Engaged in Protected Activity . . . . . . . . . . . . . . . . . . . . .  54

B.     Ms. Frank Suffered a Materially Adverse Employment Action . . . . 55

C.     Ms. Frank Demonstrated a Causal Connection . . . . . . . . . . . . . . . . 57

D.      Ms. Frank Also Demonstrated Pretext . . . . . . . . . . . . . . . . . . . . . . 58

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

STATEMENT REQUESTING ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . 61

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) . . . . . . . . . . . . . . . . . . 63

CERTIFICATE OF DIGITAL SUBMISSION . . . . . . . . . . . . . . . . . . . . . . . . . . 64

NOTICE OF FILING AND PROOF OF SERVICE . . . . . . . . . . . . . . . . . . . . . . 65

ADDENDUM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

Memorandum and Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addendum-1

Judgment in a Civil Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addendum-28

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664 (10th Cir. 1998) . . . . . . . . . . . 42, 51, 52, 53

*Barrett v. Salt Lake Cty.,* 754 F.3d 864 (10th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Baty v. Willamette Indus., Inc.,* 172 F.3d 1232 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . 51

*Bertsch v. Overstock,* 684 F.3d 1023 (10th Cir. 2012). . . . . . . . . . . . . . . . . . . . . 24, 33, 59

*Bertsch v. Overstock.com,* 684 F.3d 1023 (10th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . 54

*Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53 (2006) . . . . . . . . . . . . . . . . . . . 54

*Cadena v. Pacesetter Corp.,* 18 F. Supp. 2d 1220 (D. Kan. 1998). . . . . . . . . . . . . . . . . 38

*Cone v. Longmont United Hosp. Ass'n,* 14 F.3d 526 (10th Cir. 1994). . . . . . . . . . . . . . 26

*Crowley v. L.L. Bean, Inc.,* 303 F.3d 387 (1st Cir.2002) . . . . . . . . . . . . . . . . . . . . . . 43, 44

*Curran v. AMI Fireplace Co. Inc.,* 163 F. App'x 714 (10th Cir. 2006) . . . . . . . . . . . 32, 39

*Daniels v. UPS, Inc.,* 701 F.3d 620 (10th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . 25, 54

*Daniels v. United Parcel Serv., Inc.,* 701 F.3d 620 (10th Cir. 2012) . . . . . . . . . . . . . 53, 54

*Debord v. Mercy Health Sys. of Kan., Inc.,* 737 F.3d 642 (10th Cir. 2013)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 47, 48, 49, 50

*Delsa Brooke Sanderson v. Wyoming Highway Patrol,* 976 F.3d 1164 (10th Cir. 2020)  34

*Deters v. Equifax Credit Info. Servs., Inc.,* 202 F.3d 1262 (10th Cir. 2000) . . . . . . . . . 41

*EEOC v. PVNF, LLC,* 487 F.3d 790 (10th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Faragher v. City of Boca Raton,* 524 U.S. 775 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Fye v. Oklahoma Corp. Comm'n,* 516 F.3d 1217 (10th Cir. 2008) . . . . . . . . . . . . . . . . 54

*Harris v. Forklift Systems, Inc.,* 510 U.S. 17 (1993) . . . . . . . . . . . . . . . . . . . 27, 28, 29, 30

*Harsco Corp. v. Renner,* 475 F.3d 1179 (10th Cir. 2007) . . . . . . . . . 27, 29, 30, 31, 37, 39

*Heinrich v. City of Casper,* 526 F. App'x 862 (10th Cir. 2013) . . . . . . . . . . . . . . . . . . . . 7

*Hernandez v. Valley View Hosp. Ass'n,* 684 F.3d 950 (10th Cir. 2012) . . . . . . . . . . . . . 26

*Hernandez v. Valley View Hosp. Assoc.,* 684 F.3d 950 (10th Cir. 2012) . . . . . . . . . . . . 32

*Hicks v. Gates Rubber Co.,* 833 F.2d 1406 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . 27

*Hirase-Doi v. U.S. West Comm'ns,* 61 F.3d 777 (10th Cir. 1995) . . . . . . . . . . . 23, 45, 46

*Kramer v. Wasatch Cty. Sheriff's Off.,* 743 F.3d 726 (10th Cir. 2014) . . . . . . . . 41, 43, 51

*Marx v. Schnuck Mkts., Inc.,* 76 F.3d 324 (10th Cir.1996) . . . . . . . . . . . . . . . . . . . . . . . 56

*McCowan v. All Star Maint., Inc.,* 273 F.3d 917 (10th Cir. 2001) . . . . . . . . . . . . . . . . . 37

*Mendoza v. Borden,* 195 F.3d 1238 (11th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57 (1986) . . . . . . . . . . . . . . . . . . . . . . . 27, 29

*Minarsky v. Susquehanna Cty.,* 895 F.3d 303 (3d Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . 42

*Morgan v. Hilti, Inc.,* 108 F.3d 1319 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . 57, 59

*Morris v. City of Colorado Springs,* 666 F.3d 654 (10th Cir. 2012) . . . . . . . . . . 34, 35, 36

*O'Shea v. Yellow Tech. Servs., Inc.,* 185 F.3d 1093 (10th Cir. 1999) . . . . . . . . . . . . . . . 26

*Orr v. City of Albuquerque,* 417 F.3d 1144 (10th Cir.2005) . . . . . . . . . . . . . . . . . . . . . . 53

*Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133 (2000) . . . . . . . . . . . . . . . . 26

*See also Smith v. Nw. Fin. Acceptance, Inc.,* 129 F.3d 1408 (10th Cir. 1997) . . . . . . . . 33

iv

*Smith v. Century Concrete, Inc.,* 2006 WL 1877013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Sprague v. Thorn Ams., Inc.,* 129 F.3d 1355 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . 36

*Swackhammer v. Sprint/United Mgmt. Co.,* 493 F.3d 1160 (10th Cir. 2007). . . . . . . . . 25

*Tademy v. Union Pac. Corp.,* 614 F.3d 1132 (10th Cir. 2008). . . . . . . . . . . . . . . . . . . . . 30

*Tesone v. Empire Mktg. Strategies,* 942 F.3d 979 (10th Cir. 2019) . . . . . . . . . . . . . . . . 43

*Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248 (1981) . . . . . . . . . . . . . . . . . . . 53

*Thom v. Bristol-Myers Squibb Co.,* 353 F.3d 848 (10th Cir. 2003) . . . . . . . . . . . . . . . . 25

*Throupe v. Univ. of Denver,* 988 F.3d 1243 (10th Cir. 2021) . . . . . . . . . . . . . . . . . . 34, 35

*Tolan v. Cotton,* 134 S.Ct. 1861 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

*Turrentine v. United Parcel Serv., Inc.,* 645 F. Supp. 2d 976 (D. Kan. 2009) . . . . . . . . 58

*Vance v. Ball State Univ.,* 133 S. Ct. 2434 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 40

*Williams v. W.D. Sports, N.M., Inc.,* 497 F.3d 1079 (10th Cir.2007). . . . . . . . . . . . . . . 54

*Zisumbo v. Ogden Reg'l Med. Ctr.,* 801 F.3d 1185 (10th Cir. 2015) . . . . . . . 56, 57, 58, 59

## STATUTES AND REGULATIONS

28 U.S.C. § 1331, 28. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. §1343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. § 2000(e) et seq . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. § 2000e-2(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

29 C.F.R. § 1604.11(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

## **RULES**

Fed.R.Civ.P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Fed. R. App. P. 4(a)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed.R. App.P. 28(a)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Fed. R. Evid. 801(d)(2)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

## **STATEMENT OF RELATED CASES**

There are no prior or related cases or appeals.

vi

## JURISDICTIONAL STATEMENT

Jurisdiction in the District Court was based upon 28 U.S.C. § 1331, 28 U.S.C. §1343, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) et seq.

Jurisdiction in this Court is based upon 28 U.S.C. § 1291, as an appeal from a final decision and judgment of the District Court entered on February 17, 2022, disposing of all claims. App. Vol. 2 at 145. Appellant's notice of appeal was timely filed on February 18, 2022, pursuant to Fed. R. App. P. 4(a)(1)(B). App. Vol. 2 at 163.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.      Whether the District Court erred in granting summary judgment on Ms. Frank's claim for a hostile work environment based on sexual harassment, by undercounting the number of discriminatory incidents in the record, and not crediting evidence of abusive conduct that was gender-neutral as required by the totality of the circumstances standard?

2.      Whether the District Court erred in finding that Heartland did not have notice based on prior harassment that was widespread in the workplace, involving eight to ten other women?

3.      Did the District Court err in granting summary judgment on Ms. Frank's retaliation claim, by applying an incorrect legal standard for an adverse employment action, rather than the materially adverse standard which applies to retaliation claims?

4.      Did the District Court err in holding that the imposition of a deadline to find another job, or be fired – one week after Ms. Frank reported sexual harassment – was not a materially adverse employment action, which would dissuade a reasonable employee from making or supporting a Charge of Discrimination?

## **STATEMENT OF THE CASE**

Pursuant to Fed.R.App.P. 28(a)(6), Ms. Frank provides the following statement

to describe relevant procedural history, identify the rulings presented for review, and

identify facts relevant to the issues on appeal:

## **I.     RELEVANT PROCEDURAL HISTORY**

On Ocrtober 7, 2020, Ms. Frank filed her two-count Complaint against her

former employer, Heartland, alleging a hostile work environment based on sex, and

retaliation by forcing her to find other employment or be terminated because of her

protected activity of reporting sexual harassment. (App. Vol. 1 at 10-17). Heartland

filed its Answer on February 19, 2021. (App. Vol. 1 at 22-28). The magistrate judge

entered an Order granting Ms. Frank's Motion to Compel on July 12, 2021. (App.

Vol. 1 at 29). The Pretrial Order was entered on November 1, 2021. (App. Vol. 1 at

37). Heartland filed its motion for summary judgment and suggestions in support on

November 19, 2021. (App. Vol. 1 at 45, 47). Ms. Frank responded on December 15,

2021. (App. Vol. 1 at 153), On January 14, 2021, Heartland timely filed its reply in

further support. (App. Vol. 2 at 97).

On February 17, 2022, the District Court entered its Memorandum & Order

granting summary judgment on both claims. (App. Vol. 2 at 145) and entered a final

judgment in Heartland's favor. (App. Vol. 2 at 162). Ms. Frank timely filed her Notie

of Appeal on February 18, 2022. (App. Vol. 2 at 163).

## RULINGS PRESENTED FOR REVIEW:

Ms. Frank's appeal challenges the entry of summary judgment in Heartland's favor on both counts alleged in her Complaint. Specifically, Ms. Frank argues it was error for the District Court to make the following decisions: (1) that Ms. Frank did not present sufficient evidence of a hostile work environment based on sex; (App. Vol. 2 at 148-154); that, alternatively, Ms. Frank did demonstrate that Heartland had constructive notice of harassment by her co-worker; (App. Vol. 2 at 154-157); (3) that Ms. Frank failed to make a *prima facie* case of retaliation because she did not demonstrate an adverse employment action; (App. Vol. 2 at 157-159), and (4) that Ms. Frank failed to demonstrate the reason articulated by Heartland was pretext for an illegally-motivated termination. (App. Vol. 2 at 159-161). This Court should reverse and remand both Counts for further proceedings in District Court.

## STATEMENT OF FACTS

Plaintiff-Appellant Tracie E. Frank began working for Heartland Rehabilitation Hospital, LLC., ("Heartland") in Overland Park, Kansas, on June 25, 2018, as an Executive Assistant. (Vol. 2, App. Vol. 2 at 113). Ms. Frank's supervisor was the Director of Nursing, Alicia Sorensen. (App. Vol. II, p. 236, Frank deposition, p. 162). Heartland's parent corporation is Post-Acute Medical, which operate hospitals throughout the United States. (App. Vol. I at 248, deposition of Penny Craig, pp. 23-24). Heartland uses personnel policies supplied by Post-Acute at the Overland Park facility. (App. Vol II, p. 113).

Ms. Frank previously had worked as a department assistant at Continuum of Care, from 2011 to 2016, in Topeka, Kansas. (App. Vol. 1 at 200, Frank deposition, p. 18). Her duties included managing the director's calendar, scheduling meetings, preparing agendas, and payroll processing. *Id.,* p. 18. She left that position after she obtained her Bachelor's Degree. *Id.,* p. 19.

Ms. Frank then worked at Stormont Vail Hospital in Topeka, as a business coordinator, from September 2016, until she began working at Heartland in June 2018. (App. Vol. 1 at 201, Frank deposition, p. 23). Her duties at Stormont Vail included managing the director's calendar, preparing monthly budgets, and processing payroll. *Id.*

## A.     Heartland Hospital's Management Structure.

The CEO at Heartland was John Hughes. (App. Vol. II at 6, Hughes deposition, pp. 7, 9). During Ms. Frank's employment, Penny Craig was the Director of Human Resources, responsible for investigating complaints of sexual harassment. (App. Vol. 1 at 246; Craig deposition, pp. 16-17.)[1] Ms. Craig has no degrees or certifications in the field of Human Resources. *Id.,* Craig deposition, p. 16. She reported to John Hughes, and also to Post-Acute's Regional Director of Human Resources, Troy Johnson. (App. Vol. I, p. 248, Craig deposition, p. 24).

Hughes also supervised Adriel Robinson, who was Director of Quality at the hospital. (App. Vol. 2 at 7, 22. Hughes deposition, pp. 12, 72). Robinson, who was also a registered nurse, was hired in 2017. (App. Vol. 1, at 277, Craig deposition, pp. 138, 140.). His job duties included preparing audits regarding patient outcomes, and patient rights. (App. Vol. 2, at 12, Hughes dep., p. 32; App. Vol. 2 at 95).

The hospital is a two-story building, with the executive offices located on the second floor. (Exh. 5, Sorensen deposition, p. 12, App. Vol. 2, p. 43). Ms. Frank

---

[1] Ms. Craig testified as Heartland's corporate representative, and her responses are therefore admissible against the corporation. App. Vol. 1 at 246, Craig deposition, p. 14, lines 11-15. *See Heinrich v. City of Casper,* 526 F. App'x 862, 863 (10th Cir. 2013) ("A Rule 30(b)(6) designee's testimony is, as well, surely admissible against the city at trial.") (Gorsuch, J.).

described it as "a very tight area," where employees could overhear each other if their door were open. (App. Vol. 1 at 207, Frank deposition, pp. 47-48). Ms. Frank and Robinson worked in adjoining offices. (App. Vol. I, at 270, Craig deposition, p. 12).

**B.      Heartland's Progressive Discipline, and Harassment Policies.**

Ms. Craig testified that Heartland has a progressive discipline policy, which provides four steps of discipline: a verbal warning, written warning, final warning, and termination. (App. Vol. I, at 251, Craig deposition, p. 35).

Heartland's harassment policy provides that appropriate corrective action(s) will be taken if an employee violates the policy. App. Vol. 2 at 73-74, Harassment Policy. The policy lists the lowest disciplinary action as a written warning, progressing to probation, suspension, and termination. *Id.* However, Robinson never received even a written warning for sexual harassment. (App. Vol. 2 at 25, Hughes deposition, p. 82).

**C.      Robinson's Harassment of Heartland's Female Employees**

Beginning in 2017, and continuing into August 2019 – when he resigned – Heartland received numerous complaints of sexual harassment about Robinson. (App. Vol. 1 at 187-88; App. Vol. 1 at 103-152, Robinson's disciplinary file; App. Vol. 2 at 77, Declaration of Angela Welch).

8

### D.     Angela Welch's Prior Reporting of Robinson

Ms. Welch, a former Chief Nursing Officer at Heartland, filed a Charge of Discrimination in December 2017 with the Equal Employment Opportunity Commission ("EEOC"), alleging harassment by Hughes, and Robinson. (App. Vol. II at 77, Declaration of Angela Welch). On December 9, 2017, Ms. Welch submitted a letter of resignation, which was attached to her Charge of Discrimination. *Id.,* App. Vol. 2 at 82-92.[2]

Ms. Welch described harassment by Hughes,  – and Robinson – which forced her to resign.

> [I]n September 2017, our Quality Director, Adriel Robinson, (who was called "Dre"), had called me "babe" at a meeting, and ·told me that I should wear heels more often because they made me look more sexy. I reported these offensive comments to Human Resources, and to John Hughes, but no disciplinary action was taken. Instead, Hughes told me, "Well, that's Dre for you. He is just being a man and is somewhat naive about what he should and should not say."

(App. Vol. 2, pp. 80-81).

Despite her reports, Heartland did not issue any discipline to Hughes, or Robinson. (App. Vol. 2 at 27, Hughes deposition, p. 92; App. Vol. 1 at 41, Pretrial

---

[2]  Heartland retained counsel to investigate Ms. Welch's charge of discrimination, which was later settled at an EEOC mediation.  (App. Vol. 2 at 34, Hughes deposition, p. 120). Her charge was settled in March 2018 at an EEOC mediation. App. Vol. 2 at 77, Welch Declaration, ¶ 5.

Order, p. 5) ("Defendant had not, however, previously been able to corroborate sexual harassment allegations against Mr. Robinson.").

When Ms. Welch initially reported Robinson's comment to Hughes, he told her that "he does not want to get involved" and that she needed to talk to Dre Robinson herself. App. Vol. 2 at 82. Ms. Welch then met with Robinson, as instructed, and told him directly that his comments made her uncomfortable. *Id.*

However, one or two weeks later, Robinson again told Ms. Welch she should wear heels more often because they make her look, "taller and more sexy." *Id.* Ms. Welch told him this was unacceptable and she was "completely offended." *Id.* She reported this to Hughes, who stated, "that's just how Dre is," and that she should speak to him again if it bothered her. *Id.*

On the same day, Ms. Welch also told Hughes that she had seen Robinson making inappropriate statements to Rebecca Colbern, the Director of Health and Information, regarding the outfits she was wearing, and that he would whistle at Ms. Colbern. *Id.*

In the following months, Robinson continued making offensive comments, which she reported to Hughes. (App. Vol. 2 at 82-83). After one report, Hughes pulled Ms. Welch into his office, and stated: "I was wrong about the stuff that you had reported about Robinson's behavior and wanted you to know that." She

10

responded, "How so?" Hughes then stated, "more inappropriate things have been reported by others." *Id.*

### E.     Heartland's Fall  2018 Investigation of Robinson.

In September 2018, a unit secretary, Te'Cara Williams, reported to Human Resources that Robinson insulted her by asking how she could afford to have a new iPhone, and artificial fingernails, and that she must be "selling weed" to afford them. (App. Vol. 1 at 106; Craig deposition, pp. 79-81). Two witnesses were interviewed in the investigation of her report, but Ms. Williams was not. (App. Vol. 1 at 112-115).

Ms. Craig interviewed two of the hospital's directors, Rebecca Colbern, and Megan Hall. *Id.* Ms. Colbern confirmed that Ms. Williams had complained to her about Robinson. App. 112. She stated that Robinson made a "derogatory statement that was overheard by multiple people," that Robinson said another director, George Riley did not like her "because you're white." App. 112. Robinson had made this comment "multiple times." *Id.*

 Colbern also described hearing Robinson make inappropriate remarks that offended her, and other female employees. These included comments about wanting to see women's feet; acting "arrogant" and "bossy" towards her; and that she should "lay off the bread."  App. 113.

In a meeting on September 7, 2018, Ms. Hall, who was the Director of Therapy,

11

confirmed hearing numerous offensive comments by Robinson. (App. Vol. 1 at 114-15, Statement of Megan Hall; App. Vol. 2, at 95, Management Roster; App. Vol. I, at 247, Craig deposition, p. 20).  Ms. Hall is now the CEO of Heartland, after Hughes resigned in July 2021. (App. Vol. 2 at 21, Hughes deposition, p. 66, lines 18:23).

She reported that in the fall of 2018, Robinson stated in her presence:  ". . . black people always have to be nice to white women," and, "That's how black people like George are raised, he has to be nice to them, even those he doesn't like." App. 114, Statement of Megan Hall.  She described other offensive comments including asking her if she "straightened your hair to see your male gynecologist;" saying that a female physician "[is] pregnant and unable to do a good job," and, when new employees were hired, asking, "Is she hot?" *Id.*  She also heard him insulting Ms. Colbern, such as about, "living with mommy and daddy," and, telling her, "[I]f you eat that you won't fit into your pretty clothes." Angela Welch had also told her about Robinson's offensive comments to her; and Hughes's executive assistant, Cheryl Morrison told her, "He just creeps me out, makes me feel weird." (App. 114, Statement of Megan Hall).

After the Fall 2018 investigation, Robinson did not receive any formal disciplinary action, but was required to sign a document stating, "My signature on this form is my agreement that I will cease-and-desist the actions that are perceived

as being harassing in nature." App. 106, dated September 17, 2018. He also was required to complete "cultural diversity" training. (App. Vol. 1, at 105, 107).

### E.     February 2019 Harassment of Rebecca Silverman

A few months later, in February 2019, Rebecca Silverman complained to Troy Johnson, who was filling in for Ms. Craig, that Robinson made an offensive comment to her. (App. Vol. I at 133. App. Vol. I, at 273, Craig deposition, p. 122). Johnson was employed as the Regional Human Resources Director over Ms. Craig. (App. Vol. 1 at 248, Craig deposition, p. 24).

Ms. Silverman, who worked in the materials department, stated that she had delivered a package to Robinson's office – unopened – but had removed the packing slip.  App. Vol. 1 at 133. Robinson called her, and berated her about opening his package.  *Id.* Ms. Silverman denied doing so, and Robinson asked her, "What if it was a dildo or something?" *Id.* She reported that his use of this sexual term made her uncomfortable. "The comment Dre made regarding dildo's (sic) made Rebecca uncomfortable." *Id.*

In a note to file, Craig stated, "John feels Dre said it." App. Vol. 1, at 139; However, when asked about this investigation, Hughes was evasive.

A.     I can't be clear on that. I really can't be clear on that because I --
        I don't even -- I don't remember the discussion in which the
        context for this to be, you know, kind of stated. You know,

13

> anytime you're in an investigation, you want to -- you know, you've got to stay -- take a step back and look at – look at everything, and I don't even know when this is -- I don't know if it was after or when this was.

(App. Vol. 2 at 23, Hughes deposition, pp. 75-76). Robinson denied calling Ms. Silverman on the internal phone system that day, but company phone logs showed that he had called her three times. (App. Vol. 1 at 140; App. Vol. 1, at 273, Craig deposition, pp. 125-26).

Despite his previous harassment -- and being caught lying about calling Ms. Silverman – Robinson received no discipline, because, Ms. Craig said, she could not confirm whether Robinson used the word "dildo." (App. Vol. 1 at 274, Craig deposition, p. 128, lines 15-18) ("We didn't use the progressive discipline policy, we used a note to file.").

### G.    Robinson's Harassment of Tracie Frank

A few months after she was hired, Ms. Frank noticed that Robinson was "flirtatious with other women." (App. Vol. 1 at 207, Frank deposition, p.49). In April 2019, he began directing his advances towards her. *Id.* Robinson would eavesdrop on her conversations with a co-worker, Ms. Morrison, then walk into her office, and start asking about personal matters. *Id.*, p. 48. ("He would often just walk over and come join in our conversation.").

In April 2019, she was talking with Ms. Morrison about an upcoming date when Robinson joined their conversation. (App. Vol. 1 at 207, Frank deposition, p. 49).

> But then he turned it into, "Wow, that sounds like a dick appointment," or a dick meeting or something like that. It was very, very, – I just felt so uncomfortable I walked away, and Cheryl told him that was very inappropriate. And after that I started really feeling uncomfortable around him.

(App. Vol. 1 at 208, Frank deposition, p. 50, lines 5-17). This occurred in Ms. Morrison's office. (App. Vol. 1 at 208, Frank deposition, pp. 50-51). As Ms. Frank was walking out, Ms. Morrison yelled at Robinson: "Dre, that is so inappropriate." *Id.*, pp. 51-52.

Robinson would also enter her office, and ask Ms. Frank how her date went. App. 130. She testified that Robinson would engage in what she described as, "day-to-day stares." (App. Vol. 1 at 217, Frank deposition, pp. 86-87). Further, on multiple occasions he would say, "Oh, I like your shirt today, then would look her up and down." (App. 130, Statement of Cheryl Morrison).

In another conversation, Robinson, who is African-American, asked Ms. Frank if she had received comments from any "black dudes" on dating websites. (*Id.*, p. 57). Ms. Frank gave him an offended look, and walked away. (App. Vol. 1 at 210, Frank deposition, p. 58). But, Robinson only laughed. *Id.*

Robinson would also frequently comment on Ms. Frank's appearance with sexual overtones. As she testified:

> A.   Frequently he would look at me and tell me how nice I looked, but that particular time he looked at me and specifically his eyes were looking me up and down, specifically to my chest area and looked all the way down and up again and said, "nice shirt".  And the way he said it was very -- like a sexual tone in his voice.

(App. Vol. 1 at 209, Frank deposition, p. 55, lines 15-23). Ms. Morrison stated that she also heard him make such comments from five to seven times. (App. Vol. 1 at 129, Statement of Cheryl Morrison.)[3]

From her reactions, Robinson was aware that Ms. Frank found his comments offensive.

> A.   I basically would just -- I avoided him and walked away, and he knew.  I mean, by my reaction he knew they were unwelcome and offensive -- by my reaction to it.

*Id.,* p. 61, lines 7-13. Ms. Frank testified that she suffered "every single day," including frequent headaches because of working around Robinson. (App. Vol. 1 at 215, Frank deposition, pp. 80-81). She began keeping her office door closed, "just to feel like I was in a good, safe space" and to avoid Robinson. (App. Vol. 1 at 235,

---

[3]   The parties stipulated that Morrison's and Robinson's statements are admissible. App. 38, Pretrial Order, p. 2, Section 2(b), ¶ 8, to Deposition Exhibits 18, and Exhibit 19, respectively.

Frank deposition, p. 160). Ms. Frank testified that she was aware Robinson had harassed other women, but "nothing had been done," and the harassment continued. (App. Vol. 1 at 215, Frank deposition, p. 81, lines 3-8; p. 109).

In August 2019, Ms. Frank was walking down the hallway, when Robinson walked by and stated, "You can't miss those bad boys," while looking at her breasts. *Id.,* p. 53, lines 8-14. This occurred after he had heard Ms. Frank asking Ms. Morrison in her office if her blouse was too low cut. *Id.* When he made this demeaning remark, Robinson was walking closely by, staring at her chest. App. Vol. 1 at 208, Frank deposition, p. 53. This occurred in the hallway of the administrative area. *Id.*

Soon before she reported Robinson to Human Resources – also in August -- Robinson told Ms. Frank, and Ms. Morrison, that they should go to the supply area and retrieve a box of copy paper for him. (App. Vol. 2 at 56, Sorensen deposition, pp 61-62). Ms. Morrison responded that Robinson should do this himself; Robinson stated that he had "multiple college degrees" and was overqualified to do this task. *Id.,* p. 61. Sorensen heard this encounter, which happened her office, and told him his behavior was "wildly inappropriate." *Id.,* p. 61. She was aware that Robinson and Ms. Morrison would "constantly bicker back and forth." *Id.* p. 61, lines 9-12. However, she never reported these incidents, because she felt he was only being "very egotistical. (App. Vol. 2 at 57, Sorensen deposition, p. 66-67).

17

### H.     August 2019 Reports by Two Nurses of Demeaning Treatment.

In August 2019, two nurses complained about how Robinson mistreated them after they requested his help with a staffing shortage. (App. Vol. 1, pp. 131-132, interview notes). As the Administrator on Call, Robinson was responsible for fielding such complaints, and filling in when necessary. (App. 132; App. Vol. I, at 271, Craig deposition, pp. 116-17). One nurse, Lucy Mallya, began crying, and told Ms. Craig that she was going to resign, "based on the way Dre talked with her." She also reported this incident to Sorensen. (App. Vol. 2 at 55, Sorensen deposition, pp. 57-59).

The next day, another nurse made a similar complaint; she had called Robinson about short-staffing, with call-lights "going off all over the unit." (App. 131;  App. Vol. 1 at 271, Craig deposition, pp. 115-17). However, Robinson refused to help, stating, "You are adults, you should be able to figure it out." (App. 131; App. Vol. I, at 271, Craig deposition, pp. 116-17).

### I.     Ms. Frank's Report of  Robinson to Human Resources

On August 16, 2019, Ms. Frank reported Robinson to Ms. Craig in Human Resources. (App. Vol. I, at 248, Craig deposition, p. 26:3-4; App. Vol. 1 at 130, interview notes of Tracie Frank). Ms. Morrison had encouraged her to report so that "something might finally get done." (App. Vol. 1 at 216, Frank deposition, pp. 84-

85). She provided examples of Robinson's harassment, including looking at her chest, asking about her personal life, and commenting on her appearance. She confirmed hearing him telling Ms. Frank that a certain date she had scheduled was "a dic call." (App. Vol. 1 at 129, Statement of Cheryl Morrison). She also stated that Robinson would "undress her with his eyes," while complimenting Ms. Frank's clothing; this occurred "between 5-7 times." *Id.* As another example:

> Last week Cheryl heard Dre ask Tracie what she was doing that night. Tracie said she was going over to Doug's. Dre made a statement similar to "you know what he wants." Tracie walked off.

App. Vol. 1, at 129, statement of Cheryl Morrison.

Ms. Morrison also stated that "six to eight months before" Ms. Frank was talking about her boyfriend, Doug, when Robinson stated, "Firemen are known for wanting only one thing." (App. Vol. 1 at 129; App. Vol. 1 at 235, Frank deposition, p. 158) ("A. He said, oh, well, you know, firemen are only out for one thing.").

## J.    Heartland's Investigation of Ms. Frank's Complaint

After interviewing Ms. Frank, and Ms. Morrison, Ms. Craig interviewed Robinson on August 19, 2019, who denied making inappropriate statements to Ms. Frank. App. Vol. I, at 249, Craig deposition, p. 26. Robinson stated, "Tracie keeps her door closed and interacts with Cheryl." (App. Vol. I, at 250, Craig deposition, p. 30). He further stated, "Hasn't talked to Tracie at all about dating sites, who she's dating.

19

Only interactions with Tracie regarding staffing." *Id.*

Hughes also attended this meeting. (App. Vol. 2 at 15, Hughes deposition, p. 42). After they informed Robinson that they were planning to investigate, he walked out of the room. *Id.* He returned a few minutes later, and submitted his written resignation. *Id.,* (App. Vol. 2 at 15, Hughes dep., pp. 43-44; App. Vol. 1 at 123).

Ms. Craig testified that she made no determination about whether Robinson had violated Heartland's harassment policy. (App. Vol. I at 251, Craig deposition, p. 34, 1:14). Despite the previous complaints against Robinson, she stated, "I see each case as an individual case." (App. Vol. I, at 276, Craig deposition, p. 134). After she completes a sexual harassment investigation, Craig said she discusses her findings with Heartland's regional office to reach a decision on discipline. (App. Vol. I, at 249, 250; Craig deposition, pp. 28, 32). However, Robinson's disciplinary file does not reflect any such discussions. (App. Vol. 1 at 103-152).

### K.    Facts Regarding Ms. Frank's Job Performance, and Forced Resignation.

In January 2019, Sorensen completed an evaluation of Ms. Frank's performance, a "90-Day review." (App. Vol. 2 at 75-76, Performance Evaluation). She received positive ratings, and had no tardies since being hired. *Id.* In the "Areas of Concern" section, Sorensen wrote: "Need to continue expanding your role. Many

tasks that need to be taught while gaining confidence with existing tasks." *Id.*

In April 2019, Sorensen suddenly presented Ms. Frank with a document entitled "Last Chance Agreement," which provided for "a thirty-day review process for expected improvements" in her performance. (App. Vol. 1 at 100; App. Vol. 1 at 211, Frank deposition, pp. 64-65). It listed 13 separate changes to her job duties. *Id.,* p. 2. Ms. Frank testified that the performance issues listed were inaccurate, and exaggerated. *Id.,* pp. 65-66.

Sorensen admitted that she had no dates or documentation of the alleged deficiencies. App. Vol. 2 at 49-50, Sorensen deposition, pp. 36-37. She testified that the document was not intended to be disciplinary. *Id.* Rather, this was a form of "coaching." (App. Vol. 2 at 64, Sorensen depo. p. 96).

Ms. Frank completed all of the assigned steps in the Last Chance Agreement. After doing so, Sorensen never mentioned the document to her again. (App. Vol. 1 at 213, 214; Frank deposition, pp. 73-74; p. 75, lines 11-15). In July 2019, Ms. Frank told Sorensen that she was considering leaving Heartland for another position because of her changing job duties. (App. Vol. 1 at 212, 214, Frank deposition, pp. 69, 75). Ms. Frank testified Robinson's harassment also contributed to her decision to seek other employment. (App. Vol. 1 at 218, Frank dep. pp. 91-92). Sorensen agreed to allow her to continue working while looking for other employment. *Id.*

21

**L.      Sorensen's Deadline for Ms. Frank to Leave, or Be Fired**.

Approximately one week after she reported Robinson, Sorensen came to Ms. Frank's office, and stated she could not allow the time for her to locate another job "open-ended." (App. Vol. 1 at 232, Frank deposition, p. 148). Sorensen claimed that "corporate" was putting pressure on her to replace Ms. Frank. (App. Vol. 2 at 54, Sorensen deposition, pp. 54-55; App. Vol. 1 at 232, Frank deposition, pp. 146-47). She also claimed that Ms. Frank – after her report – was causing "increasing frustration within the organization." *Id.,* p. 55.  She gave Ms. Frank a deadline of September 13, 2019, or 17 days, to locate another job, or be fired. (App. Vol. 2 at 54, Sorensen deposition, pp. 54-55).

Ms. Frank immediately scrambled to locate another position, and found an opening at the University of Kansas Medical Center. (App. Vol. 1 at 229, Frank deposition, p. 135). She submitted her resignation on August 30, 2019, providing two weeks' notice. (App. Vol. 1 at 229, Frank deposition, pp. 135-36). Under Heartland's policy, if an employee does not provide two-weeks notice, they are not eligible for rehire. (App. Vol. I, at 249, Craig deposition, p. 27). Despite providing notice, Heartland classified Ms. Frank as "not eligible for rehire." (App. Vol. 2 at 94, Personnel Form). Ms. Frank testified that she lost one-week's pay, because of the necessity of starting on a payroll Monday, which was September 20, at her new

22

employer. App. Vol. 1 at 229, Frank deposition, pp. 136-37).

## SUMMARY OF THE ARGUMENT

The district court erred in granting summary judgment in favor of Defendant Heartland on Ms. Frank's claim of a hostile work environment based on sex, in violation of Title VII. Heartland hired Ms. Frank as an Executive Assistant to the Chief Nursing Officer, Alicia Sorensen. She worked in Heartland's executive offices on the second floor of its Hospital in Overland Park, Kansas. In an adjoining office was Heartland's Director of Quality, Adriel Robinson, who had been previously engaged in widespread harassment of female employees.

Ms. Frank presented evidence of approximately 15 instances of sexually offensive conduct, and testified that the misconduct was frequent, including daily staring, comments about her appearance, and breasts. However, the district court found this was not sufficient to show pervasiveness. The district court also concluded that Ms. Frank had failed to demonstrate constructive notice, and negligence. However, the record showed that between eight to ten women were Robinson's victims, which is sufficient under this Court's precedents, to show constructive notice. *See Hirase-Doi v. U.S. West Comm'ns,* 61 F.3d 777, 784 (10th Cir. 1995). Moreover, it is undisputed that Robinson was never disciplined.

In addition, the district court erred by dismissing Ms. Frank's claim of retaliation. She presented substantial evidence of a materially-adverse employment

24

action soon after reporting Robinson's harassment. The district court misevaluated this element of her *prima facie* case, by applying the standard for an adverse employment action. *See Bertsch v. Overstock,* 684 F.3d 1023, 1029 (10th Cir. 2012). Ms. Frank had informed her supervisor, in July 2019, that she was seeking other employment. Her supervisor agreed, and no deadline was set. Then, on August 16, she reported Robinson's harassment. One week later Sorensen told her that she must find another job by September 13, or be terminated.

Further, the district court erred in finding that Ms. Frank had not shown that the reason for this sudden deadline was pretextual. Heartland contended that it was receiving "pressure from corporate" to replace Ms. Frank. However, no evidence was presented that its corporate parent exercised any control or influence over such decisions. In addition, no documentation showed that Sorensen had received any such pressure from its corporate office to justify the sudden urgency of removing Ms. Frank.

## ARGUMENT

I.  **THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT ON MS. FRANK'S CLAIM FOR A HOSTILE WORK ENVIRONMENT.**

**Standard of Review**

The District Court dismissed Ms. Frank's sexual harassment and retaliation claims in an order granting summary judgment. Therefore, the standard of review is *de novo. Daniels v. UPS, Inc.,* 701 F.3d 620, 627 (10th Cir. 2012).This Court applies the summary judgment standard like it is deciding summary judgment for the first time. *See Swackhammer v. Sprint/United Mgmt. Co.,* 493 F.3d 1160, 1167 (10th Cir. 2007). Summary judgment is only proper where there are no genuinely disputed material facts, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party bears the burden to make this showing. *See Thom v. Bristol-Myers Squibb Co.,* 353 F.3d 848, 851 (10th Cir. 2003).

The focus of summary judgment is the identification, not the measurement, of evidence. "[I]n ruling on a motion for summary judgment, the evidence of the nonmovant it to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton,* 134 S.Ct. 1861, 1863 (2014). "[C]ourts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Id.* at 1866. The court "may not make credibility determinations or weigh the evidence."

26

*Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000); *accord Cone v. Longmont United Hosp. Ass'n,* 14 F.3d 526, 533 (10th Cir. 1994) ("Courts do not evaluate credibility or weigh the evidence…."). "[A]t the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party." *Tolan v. Cotton,* 134 S.Ct. at 1867-68.

The nature of this case makes it particularly unsuited for summary judgment. "The severity and pervasiveness evaluation [of a hostile work environment claim] is particularly unsuited for summary judgment because it is quintessentially a question of fact." *Hernandez v. Valley View Hosp. Ass'n,* 684 F.3d 950, 958 (10th Cir. 2012) (citations omitted).  Moreover, this Court has cautioned that summary judgment is seldom warranted in employment discrimination cases. *O'Shea v. Yellow Tech. Servs., Inc.,* 185 F.3d 1093, 1098 (10th Cir. 1999). This is because the cases are fact intensive and often the facts allow for competing, opposite, yet reasonable inferences.

### A.    Standard for a Hostile Work Environment

Title VII makes it unlawful for employers to discriminate "against any individual with respect to [their] compensation, terms, conditions, or privileges of employment, because of such individual's . . . [sex] . . . " 42 U.S.C. § 2000e-2(a)(1). Though Title VII's anti-discrimination provisions do not expressly prohibit harassment, the Supreme Court and this Circuit interpret Title VII's prohibition

27

against discrimination in the "terms, conditions, or privileges of employment" to prohibit *harassment* based on race, color, religion, sex, or national origin. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 66-67, 73 (1986); *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1413 (10th Cir. 1987) (citing *Vinson*); *see also Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993) (explaining that the "phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment,' which includes requiring people to work in a discriminatorily hostile or abusive environment") (*quoting Meritor,* 477 U.S. at 64).

"To establish [that] a sexually hostile work environment existed, a plaintiff must prove the following elements: (1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex; and (4) [due to the harassment's severity or pervasiveness], the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment." *Harsco Corp. v. Renner,* 475 F.3d 1179, 1186 (10th Cir. 2007) (citation omitted). Ms. Frank must show that her work environment was both subjectively and objectively hostile; that is, she must show that she perceived her work environment to be hostile, and that a reasonable person in her position would perceive it to be so. *See Harris* , 510 U.S. at 21-22.

28

Assuming all of Ms. Frank's evidence to be true, giving her the benefit of all reasonable inferences, and resolving all conflicting evidence in her favor, it is clear that she has presented sufficient evidence to establish a jury question with respect to the severity and pervasiveness of the sexual harassment she experienced at Heartland.

### B.     The District Court's Decision.

The district court improperly granted summary judgment, holding that the evidence of harassment was not sufficient to create a hostile work environment based on sex. App. at 148, Memorandum and Order, p. 4. In its view, the harassment which Ms. Frank suffered was neither severe nor pervasive. As the district court stated:

> Construing all facts in Plaintiff's favor, Robinson made four inappropriate comments, complimented Plaintiff's shirt five to seven times while looking her up and down, and frequently looked at Plaintiff and told her how nice she looked over a four-month period.

*Id.,* p. 5. The district court found that Robinson's comments were, "inappropriate and crude," but "not particularly graphic and not soliciting a sexual relationship." *Id.,* p. 6.

However, many of Robinson's remarks, including repeatedly staring at Ms. Frank's breasts, while commenting on her clothing, were sufficient to qualify as sexual advances. In addition, he stated to Ms. Frank when they were alone in a hallway, "Can't miss those bad boys." App. Vol. 1 at 208, Frank deposition, pp. 52-

29

53. He also asked if she'd received responses on dating websites from "black dudes," App. Vol. 1 at 209, Frank deposition, pp. 57-58; and would "undress her with his eyes," while staring at her chest. (App. Vol. 1 at 209, 271; Frank deposition, pp. 57-58; 86-87). As Ms. Frank – and Ms. Morrison -- stated, these were not merely isolated incidents, but part of Robinson's overall pattern, which occurred "frequently," or "often," including "day-to-day stares."

### C.    Ms. Frank Produced Evidence Showing That She Was Subjected To An Objectively Hostile Work Environment.

Whether a particular work environment is hostile or abusive is determined on a case-by-case basis guided by the totality of the circumstances.  *See Harris,* 510 U.S. at 21; *Harsco Corp. v. Renner,* 475 F.3d 1179, 1187 (10th Cir. 2007) (characterizing defense that the alleged harassing comments were gender-neutral as "circumvent[ing] the proper 'totality of the circumstances' test by conveniently stripping facts of their context, which we have affirmed to be the touchstone of our analysis.").

Sexual harassment claims are analyzed under the severe or pervasive standard. *Meritor,* 477 U.S. at 67. The test is disjunctive –  a hostile work environment claim may be established by showing either pervasiveness or severity – they "are independent and equal grounds." *Tademy v. Union Pac. Corp.,* 614 F.3d 1132, 1144 (10th Cir. 2008); *see also Faragher v. City of Boca Raton,* 524 U.S. 775, 787-88

(1998) (discussing *Harris* as "direct[ing] courts to determine whether an environment is sufficiently hostile or abusive by 'looking at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance"; *Harsco Corp.,* 475 F.3d at 1187 (same).

Ms. Frank presented many instances of Robinson's misconduct, which met the above standards:

■  Intruding into her conversations with Ms. Morrison, and asking about her personal life, such as whether she had received inquiries from "black dudes" on dating websites. *Id.,* App. Vol. 1 at 169, ¶ 13;

■  Engaging in, "day-to-day stares"; App. Vol. 1 at 217, Frank deposition, pp. 86-87;

■  During her conversation with Ms. Morrison, about an upcoming date, stating that,"[F]iremen are known for wanting only one thing;" App. Vol. 1 at 129;

■  Telling Ms. Frank, as he was walking by, "You can't miss those bad boys," referring to her breasts; (App. Vol. 1 at 208, Frank dep., pp. 52-53)'

■  When the weather was warmer, "Looking her up and down," and staring at her chest area while stating, "Nice shirt," in a provocative tone of voice. App. Vol. 1 at 129, Statement of Cheryl Morrison;

■  In August 2019, when she stated that she was going over to her boyfriend's house, Robinson replied, "You know what he wants." *Id.;*

31

- Suffering "every single day," because their offices were so close; "I could never get away from him." App. Vol. 1 at 215, Frank deposition, p. 80.

Ms. Frank also testified that she felt "ashamed and embarrassed" while hoping that the harassment would cease, which caused her to suffer from an increasing number of headaches. App. Vol. 1 at 215, Frank deposition, pp. 80-81.

### D.     Ms. Morrison's Corroborating Statement

Furthermore, Ms. Morrison, who was the executive assistant to CEO Hughes, corroborated Robinson make numerous suggestive comments about Ms. Frank's appearance.

> Beginning when the weather got warmer, Cheryl has heard Dre make comments to Tracie such as 'I like your shirt today' and Dre would look Tracie up and down, undress her with his eyes. Tracie never engaged in this, Tracie would say 'stop it' and walk off. Cheryl feels this has happened 5-7 times.

App. Vol. 1, at 129. She also gave specific examples, including the "dic meeting" comment; Robinson stating, "Firemen are known for wanting only one thing," and – the week before – Robinson stating about Ms. Frank's boyfriend, "You know what he wants," prompting Ms. Frank to walk away. *Id.*

The district court partially acknowledged this evidence, stating: "Plaintiff's coworker, Cheryl Morrison, witnessed the "dick meeting" and "firemen" comments and the up-and-down looks. Doc. 41 at 27, ¶¶ 75-76. Robinson would also frequently

32

look at Plaintiff and tell her how nice she looked. Doc. 41 at 17, ¶ 12." *See* Memorandum and Order, p. 2. However, in its analysis, the district court minimized the extent of these incidents.

This Court has reversed summary judgment where a district court similarly undercounted the number of discriminatory incidents. In *Curran v. AMI Fireplace Co. Inc.,* 163 F. App'x 714, 720–21 (10th Cir. 2006), the district court concluded that the evidence established only three separate incidents of derogatory remarks made by the harasser. *Id.* at 719. In reversing, this Court held that a careful review of the record instead showed she was *repeatedly* subjected to sexually-related remarks for a period of about five or six months. *Id.* at 720-21.

As this Court noted: "The fact that she remembered the precise nature of only two of those remarks does not undercut her sworn testimony that Payson made other, similar remarks over the course of approximately five to six months." *Curran,* 163 F. App'x at 721. And, although not physically threatening, these remarks "undoubtedly were humiliating, since they concerned Curran's physical attributes and clothing." *Id.*

Similarly, in *Hernandez v. Valley View Hosp. Assoc.,* 684 F.3d 950 (10th Cir. 2012), the Court – while emphasizing that pervasiveness is not a counting test – found that a dozen racial comments made over a 14-month period were enough to

raise a genuine issue of material fact on the issue of pervasiveness. 684 F.3d at 957–58.

By comparison, here, the evidence is comprised of at least 15 separate instances of offensive conduct, over approximately four months – which demonstrates a jury question on pervasiveness. S*ee also Smith v. Nw. Fin. Acceptance, Inc.,* 129 F.3d 1408, 1415 (10th Cir. 1997) (holding that evidence of six sexually derogatory statements over twenty-three months, some repeated frequently, sufficient to support a finding of pervasive harassment).

Indeed, Ms. Morrison stated that the up-and-down looks occurred from 5-7 times alone. (App. Vol. 1 at 129). When combined with the other incidents she corroborated, this presents a dispute of material fact on the issue of severity or pervasiveness.

### E.   The District Court Erred by Failed to Consider Evidence of Gender-Neutral Conduct.

The district court erroneously described some of Ms. Frank's evidence, such as Robinson's daily stares, as too "vague" to consider. ("Here, much of Plaintiff's evidence (particularly about looks) is vague."). *See* Memorandum and Order, p. 8. The district court muddled Robinson's conduct as involving, "scattered comments," and, "the up-and-down looks and the other looks and compliments . . ." *Id.,* p. 5.

However, as this Court has held, interpreting facially neutral conduct – such as the "other looks" and "day-to-day stares" in the context of Robinson's other sexist comments, presents a question of fact for the jury. *See Delsa Brooke Sanderson v. Wyoming Highway Patrol,* 976 F.3d 1164, 1174 (10th Cir. 2020) (citations omitted). When viewed in the context of his overtly sexist remarks, about "a dick meeting" and intrusive comments about her dating habits, and verbal and visual references to her breasts, a reasonable juror could find his overall behavior was beyond boorish and crude, but also degrading and humiliating. *See Id.*

### F.    The Cases Heartland Relied On Are Factually Distinguishable.

The district court found that Ms. Frank's evidence was not sufficient to demonstrate the "steady barrage" of offensive comments required under this Court's precedents, citing *Throupe v. Univ. of Denver,* 988 F.3d 1243, 1251 (10th Cir. 2021), and *Morris v. City of Colorado Springs,* 666 F.3d 654 (10th Cir. 2012). *See* Memorandum and Order, p. 6. However, both of these cases are readily distinguishable.

In *Throupe,* a male college professor brought an action under Title IX, arising out of his relationship with a female student. The evidence of a hostile work environment constituted of:  rumors about his relationship with the student; being subjected to a Title IX investigation, receiving a written warning, being assigned a

35

less desirable teaching schedule, and being yelled at on at least one occasion. *Id.* at 1253. Of these, this Court stated, "only the Title IX report appears to be facially sex-based." *Throupe,* 988 F.3d at 1253. The male professor conceded that the University "unequivocally had an obligation to investigate these concerns" about his relationship with a student. *Id.* at 1253-54. Thus, the facts involved in *Throupe* were not remotely similar to those presented here.

The district court also relied on this Court's decision in *Morris v. City of Colorado Springs,* 666 F.3d 654 (10th Cir. 2012), stating: "Additionally, this case is like *Morris*. Both plaintiffs worked at their relevant positions for a relatively short time. Both women were subjected to inappropriate conduct over the course of a few months." App. Vol. 2 at 153, Order, p. 9. However, *Morris* is factually distinguishable because it involved far fewer incidents – which arguably were not even sex-based – and occurred in the distinct work environment of an operating room.

In *Morris,* the district court granted summary judgment on the plaintiff's claims for First Amendment retaliation, and sexual harassment. The plaintiff, a registered nurse, claimed that a surgeon on the hospital's heart team harassed her, and committed "various torts, including outrageous conduct and battery" by flicking his finger on her head, throwing surgical tissue in her direction, and yelling at her. *Id.* at 658-59.

This Court carefully reviewed the pertinent precedents regarding establishing

severe or pervasive harassment. *Id.* at 663-665. The Court concluded that Morris's allegations of having been flicked on her head were isolated events, when viewed in the context of her "otherwise uneventful" tenure. *Id.* at 665. And, with regard to the surgical tissue incident, no other similar incidents were involved. *Id.* at 665. Finally, the Court noted, ". . . we cannot ignore the surgical context in which this incident occurred . . ." *Id.* at 668 (emphasis added).

In addition, Heartland also cited *Sprague v. Thorn Ams., Inc.,* 129 F.3d 1355, 1366 (10th Cir. 1997) in support of its argument that the harassment was not pervasive. However, in *Sprague,* the misconduct involved only five sexually-oriented comments, which occurred in a 16-months period. *Sprague,* 129 F.3d at 1366. In contrast, the record here contains frequent unwelcome comments, that were more objectionable than the mostly non-sexual comments in *Sprague.*[4]

Finally, the district court mistakenly required Ms. Frank to demonstrate "a baseline of objectively offensive conduct," before considering all of her evidence.

---

[4] The plaintiff in *Sprague* alleged five offensive incidents over 16-months involving a co-worker/supervisor: (1) a statement to plaintiff that "you really need to undo that top button"; (2) a statement correcting another person's reference to "girls" by saying that "you can't call them girls[,][y]ou have to call them ladies"; (3) a comment, regarding women and pre-menstrual syndrome, that "you know how they are at that time of the month"; (4) a comment after looking down plaintiff's wedding dress, that "you got to get it when you can"; and (5) in a conversation about "neck chains," a comment that "neck chains" sounded "kind of kinky." *Id.* at 1366.

*See* Memorandum and Order, p. 6 (*citing Mendoza v. Borden,* 195 F.3d 1238, 1257 (11th Cir. 1999)). However, this maims the Tenth Circuit's "totality of the circumstances" standard. *See Harsco Corp.,* 475 F.3d at 1186–87. Such a rule would allow the district court to pick-and-chose which evidence is relevant to a hostile work environment claim, rather than considering all of the circumstances, and the harassment's cumulative effect.

### G.     The District Court Improperly Discounted the Harassment Based on its Short Duration.

The district court also erred by improperly discounting the evidence of a hostile work environment because it occurred over a relatively short duration. *See* Memorandum and Order, p. 6. As the district court stated: "At most, these handful of remarks over the course of four months were "mere offensive utterance[s]," *See Memorandum and Order,* p. 6.

However, as this Court has observed, the shorter duration "cuts both ways," because a number of incidents, over a few months, may concentrate their hostility. *See McCowan v. All Star Maint., Inc.,* 273 F.3d 917, 926 (10th Cir. 2001) ("Alternatively, the shorter exposure time supports the equally plausible inference the abuse was so offensive as to taint the entire job site.").

Other cases involving relatively shorter time frames have reached the same

result. *See EEOC v. PVNF, LLC,* 487 F.3d 790, 799 (10th Cir. 2007) (finding sexually harassing conduct to be sufficiently pervasive such that a jury should decide the issue, where "the bulk" of the objectionable conduct occurred *during a four month period,* which the court characterized as "a relatively short period of time"); *Smith v. Century Concrete, Inc.,* 2006 WL 1877013, at *5 (D. Kan. July 6, 2006) ("*While a few weeks is a short period of time,* three inappropriate comments over this short span of time could amount to pervasive harassment in the eyes of a reasonable jury."); *Cadena v. Pacesetter Corp.,* 18 F. Supp. 2d 1220, 1228 (D. Kan. 1998) (holding that "a number of sexually suggestive and or sexually demeaning remarks, at least two of which were repeated on numerous occasions over a period *which spanned only two to three months"* was sufficiently pervasive to establish a hostile work environment). Thus, the district court clearly erred in discounting Ms. Frank's evidence on this basis.

For these reasons, the district court's decision that Ms. Frank did not prove severe or pervasive harassment, should be reversed.

## II.  Heartland Was Negligent in Failing to Adequately Respond to Robinson's Harassment

### Introduction

The district court granted summary judgment on the alternative ground that Ms. Frank had not shown that Heartland was negligent in failing to prevent Robinson's

harassment. *See* Memorandum and Order, pp. 10-12. To show negligence, Ms. Frank is required to prove that Heartland had actual or constructive knowledge of the hostile work environment, but did not adequately respond. *Harsco Corp. v. Renner,* 475 F.3d 1179, 1186 (10th Cir. 2007) (citation omitted); *Curran,* 163 F. App'x at 719.

As the Supreme Court has stated, "[A]n employer will always be liable when its negligence leads to the creation or continuation of a hostile work environment. *Vance v. Ball State Univ.,* 133 S. Ct. 2434, 2452 (2013). In addition, ". . . the nature and degree of authority wielded by the harasser is an important factor to be considered in determining whether the employer was negligent." *Id.*

Here, Robinson was a Director of the Hospital, and in charge of Quality Control. He was openly allowed to loiter in areas where women were working, such as Ms. Frank's and Ms. Morrison's offices. And, several of his female peers, also Directors, had reported harassing conduct by him, including Ms. Welch, Director of Nursing, Ms. Colbern, Director of Health and Information Management; and Ms. Hall, now CEO, who was the Director of Therapy. (App. Vol. 2 at 95, management roster).

Despite this copious notice, Heartland failed to monitor Robinson in spite of his status as a repeat harasser. As Hughes admitted:

Q.    So was anything done to monitor him more closely after this incident

in February of 2019 to see that he complied with the policy?

A.     No, not -- not to my knowledge, not -- you know, no, not to my knowledge.

(App. Vol. 2 at 30, Hughes deposition, p. 105). In reality, Heartland failed to take **any**

precautions to prevent Ms. Frank's harassment, after multiple reports, which shows

negligence. *See Vance,* 133 S.Ct. at 2453 (holding that evidence that an employer did

not monitor the workplace is relevant to prove negligence).

### A.     Heartland Authorized its Employees to Report Harassment to Supervisors, Human Resources, or its Regional Office.

Ms. Frank first reported Robinson's harassment on August 16, 2019. (App.

Vol. 1 at 130). However, previous reports, from multiple female employees, had

alerted Heartland that Ms. Frank – who officed directly next to Robinson -- could

become his next victim. In particular: two previous investigations – and Ms. Welch's

reports to Hughes and Human Resources -- provided extensive notice.[5]

Heartland authorized its employees to make such reports in its Harassment

Policy. As drafted by Post-Acute Medical ("PAM"), the policy provided that

employees may report harassment to their supervisor, the hospital's manager or

director; or the System (Regional) Human Resources Director, or representative. *Id.*

---

[5] Ms. Welch had sent her resignation letter to Post-Acute's Regional Human Resources Department, as expressly authorized in its policy. App. Vol. 2 at 72-73.

App. Vol. 2 at 72-73, Harassment Policy.

The prior reports Heartland received therefore provided official notice. *See Deters v. Equifax Credit Info. Servs., Inc.,* 202 F.3d 1262, 1270-71 (10th Cir. 2000) ("When a company specifically designates a particular employee within the company as a final person responsible for enforcing that company's policy against discrimination, then by the company's own designation, information provided to such an employee is knowledge to the company."). Thus, the question for this Court is whether the quantity and seriousness of these reports is sufficient to create a jury question on negligence.

**B.     Heartland Knew or Should Have Known of Robinson's Harassment, Because of its Overall Pervasiveness.**

Heartland's failure to take appropriate corrective actions against Robinson demonstrates negligence. In *EEOC v. Roark-Whitten Hosp. 2, LP,* 28 F.4th 136, 154 (10th Cir. 2022) (*en banc*), this Court recently observed: "In other, relatively similar employment settings, we have analogized constructive notice to "a negligence standard." (citing *Debord v. Mercy Health Sys. of Kan., Inc.,* 737 F.3d 642, 651 (10th Cir. 2013) (quotation marks omitted). In *Debord,* this Court held that "highly pervasive harassment should, in the exercise of reasonable care, be discovered by management level employees." *Id.* at 651 (internal quotation marks omitted); *see also*

*Kramer v. Wasatch Cty. Sheriff's Off.,* 743 F.3d 726, 757 (10th Cir. 2014) (analyzing constructive notice under a "pervasiveness plus" standard).

The district court erroneously stated that Ms. Frank was relying on the "dangerous employee theory" to show constructive notice. *See* Memorandum and Order, p. 11. However, Ms. Frank instead presented evidence that Heartland had notice because of Robinson's "widespread campaign of harassment against other women." App. Vol. 1 at 186, Summary Judgment Response, p. 34. She was aware that other women had previously reported him, but nothing had been done. App. Vol. 1 at 216, Frank deposition, pp. 84-85. *See Minarsky v. Susquehanna Cty.,* 895 F.3d 303, 316 (3d Cir. 2018): "A jury could find that Minarsky reasonably believed that availing herself of the anti-harassment policy would be futile, if not detrimental."

Heartland may avoid liability for negligence if it undertakes remedial and preventative action "reasonably calculated to end the harassment." *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 676 (10th Cir. 1998). But that was absent here. Instead, the remedial actions amounted to counseling Robinson for "perceived arrogance and bossiness," -- and instructing him watch a video about "cultural diversity."(App. Vol. 1 at 113; App. Vol. 2 at 19, Hughes deposition, p. 58). At the least, a genuine dispute of fact exists whether Heartland failed to take appropriate remedial actions, which should be resolved by a jury.

43

### C. The District Court Overlooked Numerous Incidents Which Showed Constructive Notice of a Hostile Work Environment at Heartland.

The district court stated that it considered all of Ms. Frank's evidence of prior harassment as admissible. *See* Memorandum and Order, p. 10. However, it miscounted the incidents in Ms. Welch's Declaration. The district court also minimized other reported incidents, as described below, diluting Ms. Frank's evidence in violation of the totality of circumstances standard.

### 1. The Prior Reports of Other Harassment Are Admissible, and Nonhearsay.

The investigation reports in Robinson's disciplinary file are admissible, and non-hearsay for three reasons. First, they were "made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D). Second, Heartland itself provided this file to the district court in its summary judgment papers. App. Vol. 1 at 103. As a result, it waived any objection to its admissibility. *See Tesone v. Empire Mktg. Strategies,* 942 F.3d 979, 1000 (10th Cir. 2019) (holding defendants waived any objections to the admissibility of the reports by offering them themselves). Third, they are also nonhearsay because they were not offered to show the truth of the matter – that Robinson had previously harassed other women – but to show notice of his harassment. *See Kramer,* 743 F.3d at 755–56, n. 20 (*citing Crowley v. L.L. Bean, Inc.,* 303 F.3d 387, 408 (1st Cir.2002)

44

(out-of-court statement not hearsay because not offered to prove actual past harassment, but employer's knowledge of alleged past harassment).

**2.    The District Court Miscounted and Minimized the Number of Instances of Robinson's Harassment.**

The district court analyzed the question of notice by first stating that Robinson was involved in only four previous "instances of misbehavior." *See* Memorandum and Order, pp. 11-12. These were:  in December 2017, Angela Welch quoted offensive statements by Robinson in her Charge of Discrimination; in September 2018, Te'Cara Williams reported offensive comments; in February 2019, a materials department employee reported that Robinson used the word "dildo" in a conversation; and in August 2019, two nurses reported that Robinson mistreated them after they had called him about staffing problems. *Id.*

The problem with the district court's analysis is that these were *investigations* -- which turned up other victims – not single instances. The district court thereby overlooked that at least five women were identified as suffering from harassment in the Fall 2018 investigation alone. These included: Te'Cara Williams, Cheryl Morrison, Dr. Miles, Rebecca Colbern, and Megan Hall. (App. Vol. 1 at 105; 112-114). Combined with Ms. Welch's report, (App. Vol. 2 at 77), the subsequent reports by Rebecca Silverman in February 2019, (App. Vol. at 133), and two nurses – Ms.

Muthoka, and Ms. Mallya, in August 2019, brings the total to at least eight women, with numerous repeated instances among them. (App. Vol. 1 at 131-32).

As described below, these facts are sufficient to show that widespread harassment existed at Heartland which created a hostile work environment. *See Hirase-Doi,* 61 F.3d at 784 (holding that genuine issue of fact on constructive notice existed, based on as many as eight to ten victims).

The district court also overlooked an incident in August 2019, of Robinson directing Ms. Frank and Ms. Morrison to retrieve copy paper for him, in August 2019. Sorensen overheard this outside of her office, calling out Robinson's behavior, "wildly inappropriate." (App. Vol. 2 at 56, Sorensen deposition, p. 61:18-21. Although less serious, it is still relevant to show that Robinson continued demeaning women in August 2019.

### D. Ms. Welch's Previous Reports Showed That Robinson Repeatedly Subjected Her to Offensive Comments, and Conduct.

Ms. Frank presented evidence that Angela Welch, the former Director of Nursing, had complained to CEO Hughes, and to the Regional Human Resources about harassment by Robinson. However, the district court minimized Ms. Welch's evidence, stating that her charge "was not directed towards Robinson, and she only accused Robinson of making two inappropriate remarks." *See* Memorandum and

Order, p. 12. This is incorrect. Although Ms. Welch's Charge itself only listed two examples, her letter of resignation – attached to it – identified several more. (App. Vol. 2, pp. 82-92).[6]

As Ms. Welch stated, in September 2017, she reported to Hughes that Robinson had called her "babe" at a meeting, and told her she should wear high heels more often because they made her "look more sexy." (App. Vol. 2, pp. 80-83). In response, Hughes initially told her, "Well, that's Dre for you. He is just being a man and is somewhat naive about what he should and should not say." (App. Vol. 2, pp. 81-82, Welch Charge of Discrimination). After further complaints, Hughes repeated ,"That's just how Dre is . . ." and she should talk with Robinson *again* to work things out. *Id.,* at p. 82.

In the following months, Robinson continued making inappropriate comments. *Id.,* p. 82. After one such report, Hughes pulled Ms. Welch into his office, and stated: "I was wrong about the stuff that you had reported about Robinson's behavior and wanted you to know that." *Id.,* at pp. 82-83. He further admitted: "more inappropriate things have been reported by others." *Id.*

Each time she reported Robinson's harassment, Hughes would respond by

---

[6] Ms. Frank pointed out these facts in her summary judgment response. (App. Vol. 1 at 22-24, ¶¶ 38-56).

telling her, "Well, that's Dre for you, he is just being a man . . ." and instruct her to confront him again. (App. Vol. 1 at 174-75, ¶¶ 41-50). This included reporting to Hughes that she heard Robinson whistle at Ms. Colbern, which he brushed off as her having "a history" with Robinson. (App. Vol. 1 at 175, ¶¶ 47-48).

In addition, Ms. Welch reported sexist comments by Hughes himself. These included, "It is a true fact that women's success in the workplace is based on how they look." App. 81. She also reported his frequent outbursts, which he would later apologize for, (App. Vol. 2 at 83); telling stories about the women he dated after his second divorce; (App. Vol. 2 at 85); and other hostile treatment, which caused her to seek medical treatment, and ultimately to resign. App. Vol. 2 at 88-92.

However, the district court did not discuss these facts, which demonstrated that Heartland had a culture of tolerating harassment. Indeed, Hughes was directly involved in supervising Robinson, but ignored repeated reports about him.

Although the district court said that Ms. Welch's evidence "most closely resembles" Ms. Frank's; it also noted that it occurred "over a year and a half before Plaintiff reported Robinson." *See* Memorandum and Order, p. 12. However, in *Debord* this Court considered evidence of alleged harassment that occurred some three years before the plaintiff was hired. *See Debord,* 737 F.3d at 651. A reasonable jury could find that Heartland's response to Ms. Welch's complaints was negligent.

48

*See Baty,* 172 F.3d at 1244-45 (holding that "recklessness and malice are inferred when a manager responsible for setting or enforcing policy does not respond to complaints, despite knowledge of serious harassment.").

### E.    The September 2018 Investigation Identified Six Victims.

In September 2018 Heartland received a complaint from Ms. Williams that Robinson had told her she must be "selling weed" in order to afford a new iPhone. (App. Vol. 1 at 176-77, ¶ 58). In the ensuing investigation,  Heartland interviewed Rebecca Colbern, the Director of Health and Information Services, and Megan Hall, Director of Therapy, App. Vol. 1 at 112-14. CEO Hughes participated in the investigation. App. Vol. 1 at 105; 112-13.

Ms. Colbern reported that Robinson said in a meeting that George Riley, the Director of Plant Operations, "doesn't like you because you're white." App. Vol. 1 at 112. He had said this "multiple times." *Id.* Robinson also made "joking" comments about wanting to see other women's feet. App. 112. He also humiliated Ms. Colbern about her weight, stating, "Rebecca, you need to lay off the bread." App. Vol. 1 at 113. Other women told her, "He's annoying and says stupid stuff." *Id.,* pp. 112-113. The investigation notes further stated that Hughes had counseled Robinson "approximately 9 months ago,"  about "perceived arrogance and bossiness" towards Ms. Colbern. App. Vol. 1 at 113.

In her interview, excerpted below, Ms. Hall confirmed that she heard Robinson making racial remarks, such as, "Black people always have to be nice to white women." App. Vol. 1 at 114. Further, Robinson told Ms. Hall, "I thought you straightened your hair to see your male gynecologist"; he made remarks about a female physician, Dr. Miles, similar to, "She's pregnant and unable to do a good job." And, when new employees were hired, Robinson would ask, "Is she hot"? *Id.*

Q: Have you heard Dre make comments to others that is inappropriate?

Example: Used to say a lot of offensive things to Rebecca Colbern regarding her clothes, living with "mommy & daddy", "if you eat that you won't fit into your pretty clothes". **Redacted**

**Redacted**

Sees Dre sitting at the nurses station a lot. See's him talking with Te'Cara a lot. It seems to be sarcastic banter with one another but Te'Cara doesn't seem to be offended.

Q: Has anyone brought to you attention that they are uncomfortable regarding Dre's comments?
A: Yea. Angela, when she was here. Rebecca Colbern "I can't believe he would say that, I don't think my clothes are bad, I'm living at home to save money" defending herself. Cheryl Morrison "he just creeps me out, makes me feel weird".

App. Vol. 1 at 114, statement of Megan Hall.

The district court stated that Heartland had "admonished" Robinson for his sexually offensive comments. *See* Memorandum and Order, p. 12. However, the note to his personnel file only stated that Robinson, "made comments that are *construed* as inappropriate." App. Vol. 1 at 105.

Heartland admits that it only **"counseled Mr. Robinson on his communication style and interpersonal skills,"** not about sexual harassment. (App.

Vol. 1 at 41, Pretrial Order, p. 5). Moreover, the only remedy provided was to require him to complete "cultural diversity training," which pertained to his racial remarks, not harassment. *Id.*

## F.    Rebecca Silverman's Report in February 2019.

Given Heartland's lackadaisical response, it is unsurprising that Robinson continued to harass and bully female employees.  In February 2019, a woman in the Materials Department, Rebecca Silverman, reported that Robinson made insulting and offensive remarks to her. App. Vol. 1 at 178-79, ¶¶ 68-74. Robinson falsely accused her of opening a package she had delivered to his office, asking her, "What if it was a dildo or something?" App. Vol. 1 at 133. Robinson was caught lying during the following investigation, denying that he ever called Ms. Silverman. App. 134. However, Heartland's phone logs showed that he had, in fact, called her three times that day. App. Vol. 1 at 273, Craig deposition, p. 125.

Heartland again failed to find a violation of its harassment policy, and instead counseled him to promote "a positive and professional environment wen (sic) communication with employees. (sic). App. Vol. 1 at 178-79, ¶¶ 70, 74. In addition, Heartland also counseled Ms. Silverman not to open his personal packages. App. 138.

## G.    Heartland's Inadequate Corrective Actions

As previously stated, Heartland never formally disciplined Robinson. App. Vol.

51

*See* App. Vol. 1 at 174, 179 ¶¶ 41, 74. This, despite the fact that its Harassment Policy called for a "written warning" as the lowest level of discipline. App. Vol. 2 at 73. As the Court is aware, under Title VII, "[e]mployers have a duty to express strong disapproval of sexual harassment, and to develop appropriate sanctions." *Kramer,* 743 F.3d 726, 749–50 (10th Cir. 2014) (*quoting Adler,* 144 F.3d at 684 (Briscoe, J., concurring in part and dissenting in part) (citing 29 C.F.R. § 1604.11(f)).

However, no discipline was imposed for one reason:  Heartland never found a violation of its harassment policy. As Heartland stated in the Pretrial Order, "Defendant had not, however, previously been able to corroborate sexual harassment allegations against Mr. Robinson." App. Vol. 1 at 41.

A reasonable jury could find Heartland was negligent in failing to prevent harassment of Ms. Frank. See *Baty v. Willamette Indus., Inc.,* 172 F.3d 1232, 1242 (10th Cir. 1999) ("The jury could also have reasonably found that the investigation conducted by defendant was a sham given the investigators' conclusion that no harassment had taken place at the plant and defendant's refusal to discipline any of its employees."). A similar issue is presented here, which should be resolved by a jury. *See Adler,* 144 F.3d at 676 (stating that "[c]ourts have explained that simply indicating to a perpetrator the existence of a policy against harassment is usually insufficient" to constitute an effective response).

Finally, the district court further erred in failing to determine that Heartland did not progressively stiffen its disciplinary actions when they proved ineffective. As this Court has held,

> The employer is, of course, obliged to respond to any repeat conduct; and whether the next employer response is reasonable may very well depend upon whether the employer progressively stiffens its discipline, or vainly hopes that no response, or the same response as before, will be effective.

*Adler,* 144 F.3d at 676. But, here, the district court failed to even discuss this factor. A reasonable jury could find that Heartland's response to Ms. Welch's multiple complaints – including in a written letter delivered to Human Resources – was not reasonable. Indeed, Craig admitted this was how she handled sexual harassment investigations: on a "case-by-case basis." App. Vol. 1 at 275, Craig deposition, pp. 130-31; 132. As she testified, "I see each case as an individual case." App. Vol. I, at 276, Craig deposition, p. 134.

Under these circumstances, a genuine dispute of fact also exists regarding whether Heartland took effective remedial action. As a result, summary judgment on this issue should also be reversed.

53

## III. GENUINE DISPUTES OF MATERIAL FACT EXIST REGARDING MS. FRANK'S CLAIM FOR RETALIATION.

The district court granted summary judgment on Ms. Frank's claim of retaliation, finding that she had not established a *prima facie* case, because she was not subjected to an adverse employment action. *See* Memorandum and Order, p. 15. In the alternative, the district court also ruled that she did not demonstrate pretext. *Id.,* pp. 15-17.

### A. Ms. Frank Engaged in Protected Activity.

To establish her case, Ms. Frank must show (1) "she engaged in protected opposition to discrimination, (2) a reasonable employee would have considered the challenged employment action materially adverse, and (3) a causal connection existed between the protected activity and the materially adverse action." *Daniels v. United Parcel Serv., Inc.,* 701 F.3d 620, 638 (10th Cir. 2012) (citation and quotation marks omitted).

The plaintiff's burden at the *prima facie* stage requires only a "small amount of proof necessary to create an inference" of discrimination or retaliation. *Orr v. City of Albuquerque,* 417 F.3d 1144, 1149 (10th Cir.2005). This burden is "not onerous." *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981).

With regard to the first element, Heartland did not dispute that Ms. Frank

engaged in protected activity when she reported Robinson's harassment. A complaint of sexual harassment "unquestionably constitutes protected activity." *Fye v. Oklahoma Corp. Comm'n,* 516 F.3d 1217, 1228 (10th Cir. 2008). This element of her *prima facie* case is therefore established.

## B. Ms. Frank Suffered a Materially Adverse Employment Action.

To be materially adverse, an action must be sufficient to "dissuade [ ] a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006). This requires injury rising to a "level of seriousness." *Williams v. W.D. Sports, N.M., Inc.,* 497 F.3d 1079, 1087 (10th Cir.2007) (internal quotation omitted).

Here, the district court applied an improper legal standard to determine whether Ms. Frank met this element of her *prima facie* case. Relying on *Daniels v. United Parcel Serv., Inc.,* 701 F.3d 620, 635 (10th Cir. 2012), the district court required Ms. Frank to demonstrate an adverse employment action, defined as a "*significant* change in employment status, . . . or a decision causing a significant change in benefits." *See* Memorandum and Order, pp. 14-15 (emphasis in original). However, that section of *Daniels* deals with the standard for a discrimination claim, not retaliation. *See also Bertsch v. Overstock.com,* 684 F.3d 1023, 1029 (10th Cir. 2012) (holding that trial court erred by relying on the pre-*Burlington Northern* standard).

Moreover, under the proper standard, Heartland's imposing a short deadline for Ms. Frank to leave, or be fired, passes muster as a materially adverse action. Merely because Ms. Frank had announced in July that she was looking for another job is an insufficient reason to terminate her. And, Heartland provided no documentation of any alleged "pressure from corporate," or "increasing frustration" that suddenly sprung up after Ms. Frank reported Robinson. Rather, the district court improperly accepted as true Heartland's assertion and ignored contrary evidence.

As Ms. Frank testified, Sorensen never spoke to her at all about the last chance agreement after April. App. Vol. 1 at 213, 214; Frank deposition, pp. 73-74; p. 75, lines 11-15. However, one week after her report, Sorensen suddenly gave her a deadline of September 13 to find another job, or be terminated. Ms. Frank scrambled, and found another position quickly – by August 30 – and submitted her two-week's notice. She did so to comply with Heartland's policy. Despite this, Heartland still labeled her as "not eligible for rehire." App. Vol. 2 at 114. She sustained a loss of one-week's pay because of the necessity of starting on a payroll-Monday at her new employer, which was September 20. (App. Vol. 1 at 229, Frank deposition, pp. 136-37).

Further, Ms. Frank could have located a better position if she had not been rushed to find a new job because of her protected activity, i.e., one with higher pay,

or better benefits. The district court erroneously considered this damage as speculative. *See* Memorandum and Order, p. 15. However, Heartland forced Ms. Frank to take any position she could find, as soon as possible, and should bear the burden of such uncertainty. *See Barrett v. Salt Lake Cty.,* 754 F.3d 864, 869 (10th Cir. 2014) (Gorsuch, J.): "The most elementary conceptions of justice ... require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." (citation omitted). Although she was able to track down a suitable position quickly, Ms. Frank still faced the prospect of being without a source of income for an indefinite period of time.

The imposition of a sudden deadline to find another job, or be fired, could dissuade a reasonable employee from making or supporting a claim of discrimination. As a result, Ms. Frank also satisfied this element of her *prima facie* case .

### C.    Ms. Frank Demonstrated a Causal Connection.

The district court did not analyze this element of Ms. Frank's *prima facie* case. *See* Memorandum and Order, p. 17, n. 7. However, as this Court has long held, "[P]rotected conduct followed closely by adverse action may justify an inference of retaliatory motive." *Marx v. Schnuck Mkts., Inc.,* 76 F.3d 324, 329 (10th Cir.1996). The very close timing here between her protected activity, and the termination deadline, meets this standard. *See Zisumbo v. Ogden Reg'l Med. Ctr.,* 801 F.3d 1185,

1200 (10th Cir. 2015); see also *Gosby v. Apache Indus. Servs., Inc.,* 30 F.4th 523 (5th Cir. April 8, 2022) (holding that employer failed to show that employee who was only short-term would have ended her employment for nondiscriminatory reasons at the same time she was fired).

### D.    Ms. Frank Also Demonstrated Pretext.

The district court erroneously found that Ms. Frank had not demonstrated a genuine dispute of fact regarding pretext. *See* Memorandum and Order, pp. 15-17. As the district court stated, "Replacing a struggling employee who wants to leave with a competent employee who wants to stay is a non-discriminatory rationale for giving Plaintiff a date certain to find new employment." *Id.,* pp. 16-17.

Under the burden-shifting framework, Ms. Frank therefore had the burden of explaining why this explanation was pretextual.  *See Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir. 1997) (plaintiff need only show such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence).

First, the district court incorrectly assumed that Ms. Frank was struggling, and not "competent," rather than adapting well to the wholesale changes Sorensen had imposed on her job duties in April. Ms. Frank had completed all of the assigned steps

in the unsigned "Last Chance Agreement." And, after doing so, Sorensen never mentioned this document to her again. App. Vol. 1 at 213, 214; Frank deposition, pp. 73-74; p. 75, lines 11-15. Although Sorensen claimed that "corporate was putting pressure on her," Heartland produced no supporting documentation, such as an email, or memorandum, and even failed to identify the source of this alleged "pressure."

Absent such documentation, Sorensen's suddenly seizing on Ms. Frank's job performance is evidence of a retaliatory motive. *See Zisumbo v. Ogden Reg'l Med. Ctr.,* 801 F.3d 1185, 1201 (10th Cir. 2015). In *Zisumbo,* the plaintiff produced evidence that her supervisor suddenly chose to resurrect a performance issue that had been dormant for months. As this Court held: "a reasonable jury could have believed that Zisumbo's abrupt termination – allegedly based on fraudulent letters that his supervisor had held for months and following closely on the heels of his complaints of race discrimination – was instead based on retaliation for Zisumbo's assertion of race discrimination." *Id.; see also Turrentine v. United Parcel Serv., Inc.,* 645 F. Supp. 2d 976, 992 (D. Kan. 2009) (Lungstrum, J.) (holding that, "In the absence of evidence explaining why these circumstances suddenly became significant in May 2007, a reasonable jury could conclude that UPS manufactured these reasons as an excuse to change plaintiff's start time in retaliation for her protected activity.").

The district court also stated that Ms. Frank "seems to rest her claim entirely

on the temporal proximity between her internal complaint about Robinson and getting her deadline from Sorensen." *See* Memorandum and Order, p. 16. However, evidence of close proximity in timing remains relevant, when combined with other evidence, to demonstrate pretexrt. *See Zisumbo,* 801 F.3d at 1200. (citations omitted).

Finally, the district court also cited this Court's decision in *Morgan, supra,* stating that the timing of Ms. Frank's termination, "simply completed the disciplinary process already set in motion." *Id.* at 1324. On the contrary: the plaintiff in *Morgan* had received another written warning in October – whereas Sorensen completely dropped the performance issue here. And, in *Morgan,* the termination occurred the following January, which was six months later, not approximately two weeks, as here. *Id.*

Although poor performance is the "quintessential legitimate nondiscriminatory reason for termination," that is not the reason given here. *Bertsch,* 684 F.3d at 1029. Instead, Heartland said it needed to replace Ms. Frank, despite no evidence of performance problems since April 2019. Thus, a reasonable jury could find her complaint was a determining factor in the decision to impose this short deadline. *See Stroup v. United Airlines, Inc.,* 26 F.4th 1147, 1160 (10th Cir. 2022) ("[T]he jury was entitled to conclude that [the employer's] dissatisfaction, even if genuine, was a pretext in the sense that it purported to be a complete explanation and was not, for age

60

was a causal factor as well.").

For these reasons, the district court's decision granting summary judgment on Ms. Frank's claim of retaliation should also be reversed.

## CONCLUSION

Based on the issues raised herein, Ms. Frank requests this Court reverse the order and judgment granting Heartland summary judgment on each of her claims. There was sufficient evidence to support the elements of each claim. Accordingly, each claim should have proceeded to trial. This Court should reverse the ruling below, and remand this case for further proceedings.

## STATEMENT REQUESTING ORAL ARGUMENT

Pursuant to 10th Cir. R. 28.1(C)(4), Ms. Frank respectfully requests this Court grant her request for oral argument. This appeal presents important issues regarding the extent and seriousness of incidents of sexual harassment needed to establish pervasive sexual harassment. In addition, it presents an important issue regarding the proper standard for determining a materially adverse employment action under Title VII.

Respectfully submitted,

BALDWIN & VERNON

By: s/Mark A. Buchanan
Of Counsel
108 South Pleasant Street
Independence, MO 64050
Tel: (816) 842-1102
Fax: (816) 842-1104
mark@markbuchananlaw.com

Attorneys for Appellant

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

**Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements**

Pursuant to Rule 32(a)(7) of the Federal Rules of Appellate Procedure, and by following the format of the Tenth Circuit Clerk's Office Form 6: "COC-1Certificate of Compliance With Type-Volume Limit," the undersigned hereby certifies that:

1.     This brief complies with the type-volume limitation of Fed.R.App.P.32(a)(7)(B) because, not counting the items listed as exempted by Fed.R.App.P.32(f),

    Appellant's Brief contains 12,958 words,

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. 32(a)(6) because:

    a.     This brief has been prepared in a proportionally spaced typeface using WordPerfect 2020 in size 14 Times New Roman font.

Date: April 27, 2022

    s/<u>Mark A. Buchanan</u>
    Attorneys for Appellant

## <u>CERTIFICATE OF DIGITAL SUBMISSION</u>

**Certificate of Compliance Regarding Privacy Redactions,
Hard Copies, and Virus Scan,**

Pursuant to Tenth Circuit ECF User Manual:

1.    All required privacy redactions have been made (see 10th Cir. R.25.5).

2.    The hard copies being provided to the Court are exact copies of the electronic copies being filed with the Court through the ECF system.

3.    Appellant's Brief was scanned for viruses with the latest version Microsoft Defender. According to the program, Appellant's Brief is free of viruses.

Date: April 27, 2022

s/<u>Mark A. Buchanan</u>
Attorneys for Appellant

64

## <u>NOTICE OF FILING AND PROOF OF SERVICE</u>

I certify that on April 27, 2022, a copy of the foregoing Appellant's Brief was filed electronically with the Clerk of Court using the CM/ECF system, which will automatically send email notification of same to the following attorneys of record. I have signed the original brief and will maintain it for a period of time not less than the maximum allowable time to complete the appellate process. Seven (7) hard copies of this brief will be securely bound and will be forwarded in a method to ensure they arrive at the clerk's office within five business days of filing, pursuant to 10th Cir. R. 31.5.

s/<u>Mark A. Buchanan</u>
Attorneys for Appellant

**ADDENDUM:**
**TABLE OF CONTENTS**

**Item**                                                **Page Number**

Memorandum and Order (Doc. 52) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addendum-1

Judgment in a Civil Action (Doc. 53) . . . . . . . . . . . . . . . . . . . . . . . . Addendum-28

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

**TRACIE FRANK,**

      **Plaintiff,**

      **v.**                    **Case No. 2:20-cv-02496-HLT-KGG**

**HEARTLAND REHABILITATION
HOSPITAL, LLC,**

      **Defendant.**

---

### MEMORANDUM AND ORDER

Plaintiff Tracie Frank brings Title VII sexual harassment and retaliation claims against her former employer. Doc. 1. Defendant Heartland Rehabilitation Hospital, LLC moves for summary judgment. Doc. 37. Because Plaintiff fails to show that she was subjected to severe and pervasive conduct sufficient to create a hostile work environment and fails to make a prima facie case for retaliation, the Court grants Defendant's motion for summary judgment.[1]

## I.  BACKGROUND[2]

Plaintiff worked for Defendant from June 2018 to September 13, 2019. Doc. 38 at 7, ¶ 1. Plaintiff worked as an executive assistant to Chief Nursing Officer Alicia Sorensen. *Id.* at 7, ¶¶ 2-3. Sorenson hired Plaintiff and was her direct supervisor. *Id.* at 7, ¶ 4. In April 2019, Sorenson presented Plaintiff with a "Last Chance Agreement" that outlined job expectations that she

---

[1]  Plaintiff moves for leave to file a surreply. Doc. 48. Defendant opposes the motion. Doc. 50. Surreplies are disfavored. *See, e.g., Dodson Int'l Parts, Inc. v. Williams Int'l Co.*, 2020 WL 4904049, at *1 (D. Kan. 2020). Plaintiff seeks leave to argue against Defendant's hearsay arguments. Doc. 48 at 2. But the hearsay arguments stem from evidence Plaintiff offered to support her factual positions. It is her burden to present appropriate evidence to support her factual positions. And Defendant does not raise a new argument by simply pointing out problems with that evidence. This is not a rare circumstance justifying a surreply, so the Court denies the motion.

[2]  The Court relies on undisputed facts and construes any disputed facts in the non-moving party's favor. Additional facts are included throughout the order.

perceived Plaintiff was failing to meet, such as making errors leading to inaccurate expense reports and failing to make appropriate staffing decisions. *Id.* at 8, ¶¶ 8-9. Plaintiff believed the document was inaccurate and exaggerated. Doc. 41 at 5, ¶ 8. By July 2019, Plaintiff told Sorenson that she was looking for a new job. *Id.* at 5, ¶ 10. On August 30, 2019, Sorenson told Plaintiff that she could not keep her job open-ended, and she gave Plaintiff until September 13 to find another job, or else she would be terminated. *See id.* at 6-7, ¶¶ 13, 15. Plaintiff had secured a job with another organization at that point. *Id.* at 9, ¶ 16. That same day, August 30, Plaintiff submitted her resignation letter and her two-weeks' notice. Doc. 38 at 9, ¶¶ 15-16.

During Plaintiff's short time working for Defendant, Adriel Robinson was Defendant's Director of Quality Management. *Id.* at 8, ¶ 6. Robinson is African American. Doc. 41 at 17, ¶ 13. Robinson was not Plaintiff's supervisor. *See* Doc. 38 at 7, ¶¶ 2, 4. Robinson's office was next to Plaintiff's. Doc. 41 at 16, ¶6. From April 2019 to August 2019, Robinson made the following comments to Plaintiff: (1) called a date Plaintiff mentioned "a dick meeting;" (2) said "you can't miss those bad boys" about Plaintiff's breasts; (3) asked whether Plaintiff had ever received any responses on dating apps from "black dudes;" and (4) told Plaintiff that "firemen are only out for one thing." Doc. 38 at 9-10, ¶ 20. Additionally, on five to seven occasions Robinson said things to Plaintiff like "I like your shirt today" while looking her up and down. Doc. 41 at 27, ¶ 76; *see also* Doc. 38 at 10, ¶ 20. Plaintiff's coworker, Cheryl Morrison, witnessed the "dick meeting" and "firemen" comments and the up-and-down looks. Doc. 41 at 27, ¶¶ 75-76. Robinson would also frequently look at Plaintiff and tell her how nice she looked. Doc. 41 at 17, ¶ 12. After the "dick meeting" comment occurred in April 2019, Plaintiff started feeling very uncomfortable around Robinson. *Id.* at 16, ¶ 7. Plaintiff also claims that she had heard Robinson had harassed other

ADDENDUM002

women, and nothing had been done about it. *Id.* at 18, ¶ 17. Plaintiff kept her office door closed to keep her distance from Robinson. Doc. 38 at 9, ¶ 19.

On August 16, 2019, Plaintiff told Sorenson that she was going to report Robinson to Human Resources. Doc. 41 at 9, ¶ 21. Sorenson supported Plaintiff telling Human Resources about Robinson and said that if something had happened to make Plaintiff uncomfortable, then she should report it. Doc. 38 at 10, ¶¶ 22-23. Plaintiff reported Robinson to Human Resources that day. *Id.* at 10, ¶ 24. Human Resources interviewed Robinson on August 19 (the next business day), and he voluntarily resigned immediately after. *Id.* at 11, ¶¶ 26-27. Plaintiff felt better after reporting Robinson. *Id.* at 11, ¶ 30. She no longer had headaches or was unhappy. *Id.* at 11, ¶ 31. After Plaintiff left Defendant's employment, she filed charges with the Equal Employment Opportunity Commission ("EEOC"), and she filed this lawsuit after receiving her right to sue letter. Doc. 1 at 2, ¶¶ 5-7.

## II.   STANDARD

Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to demonstrate that genuine issues remain for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). In applying this standard, courts view the facts and any reasonable inferences in a light most favorable to the non-moving party. *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 569 (10th Cir. 1994). "An issue of material fact is genuine if a 'reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

ADDENDUM003

III.    ANALYSIS

A.    Sexual Harassment

Plaintiff claims Defendant violated Title VII by subjecting Plaintiff to a hostile work environment based on her sex. Doc. 41 at 30. Defendant initially argues that Plaintiff has not shown that any harassment she experienced was sufficiently severe or pervasive as a matter of law. Doc. 38 at 14. Alternatively, Defendant argues that Plaintiff has not shown that Defendant knew about the sexual harassment and that its response was unreasonable. *Id.* at 20. The Court addresses each argument in turn.

**1.    No reasonable jury could find that Robinson's conduct was sufficiently severe or pervasive.**

To overcome summary judgment on a hostile-work-environment claim, a plaintiff must show that (1) she was discriminated against because of her sex, and (2) the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of her employment. *Throupe v. Univ. of Denver*, 988 F.3d 1243, 1251 (10th Cir. 2021). "Proof of either severity or pervasiveness can serve as an independent ground to sustain a hostile work environment claim." *Id.* at 1252. A plaintiff must, however, "show that the environment was both objectively and subjectively hostile or abusive." *Morris v. City of Colo. Springs*, 666 F.3d 654, 664 (10th Cir. 2012). A court must evaluate the totality of the circumstances and "consider such factors as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Throupe*, 988 F.3d at 1252 (citation omitted).

The Court will assume for the sake of argument that Plaintiff was harassed because of her sex and focus its analysis on whether that harassment was sufficiently severe or pervasive to warrant trial. Additionally, Plaintiff has presented evidence that she subjectively believed her work

ADDENDUM004

environment was hostile. *See, e.g.*, Doc. 41-1 at 87:2-5. So the Court assesses whether a reasonable person would have found the harassment either severe or pervasive.[3]

The Court must examine the totality of the circumstances. The Court first examines whether a reasonable jury could conclude that Plaintiff experienced <u>severe</u> harassment. Plaintiff has not shown that the harassment was severe. There was no tortious conduct or physical contact. *See Morris*, 666 F.3d at 658-59, 668 (holding harassment was not severe despite three separate tortious incidents). Nor was Robinson's behavior physically threatening or humiliating. *See id.* at 666-68. The harassment in this case—inappropriate comments and looks by a single employee—did not involve physical invasion or unwanted contact and falls far short of severe conduct. Under these facts, an objective person would not find the harassment here severe.

The Court second examines whether a reasonable jury could find Robinson's harassment objectively <u>pervasive</u>. Construing all facts in Plaintiff's favor, Robinson made four inappropriate comments, complimented Plaintiff's shirt five to seven times while looking her up and down, and frequently looked at Plaintiff and told her how nice she looked over a four-month period. Plaintiff closed her door while she was at work to stay away from Robinson and suffered from increased headaches due to Robinson's behavior. Thus, the issue boils down to whether Robinson's scattered comments, together with the up-and-down looks and the other looks and compliments, could objectively establish a pervasively hostile environment under the totality of the circumstances.[4]

---

[3]   The Court analyzes the severe or pervasive requirements separately because the caselaw repeatedly describes the test in the disjunctive. *See, e.g.*, *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) ("For sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" (alteration in original) (citation omitted)). Caselaw has, however, frequently blurred the distinction between the two requirements.

[4]   Plaintiff argues in passing that her knowledge that Robinson had harassed other women "heightened her perception of a hostile environment." Doc. 41 at 32. The Court has already assumed that Plaintiff subjectively believed her work environment was hostile. Plaintiff does not develop an argument about how her subjective generalized perceptions, in which she <u>does not claim</u> specific knowledge of any specific prior incident regarding Robinson, would make a reasonable person in her situation also believe the work environment was pervasively hostile. But

Robinson's comments were inappropriate and crude, and the fact that a coworker found some problematic buttresses Plaintiff's argument. But the comments are not particularly graphic and are not soliciting a sexual relationship. At most, these handful of remarks over the course of four months were "mere offensive utterance[s]," *Throupe*, 988 F.3d at 1252, and were simply not the "steady barrage" of opprobrious comments necessary to survive a summary judgment motion. *Morris*, 666 F.3d at 666.

Additionally, Robinson complimented Plaintiff's shirt five to seven times while looking her up and down and frequently looked at Plaintiff and told her how nice she looked. Apart from the five to seven up-and-down looks, Plaintiff does not describe the other looks (apart from a generalized reference to "day-to-day stares") or offer evidence that coworkers found these other looks abusive. Certainly, Plaintiff subjectively found Robinson's conduct unwelcome, but "[l]itigation by perception" alone does not survive summary judgment. *Mendoza v. Borden*, 195 F.3d 1238, 1257 (11th Cir. 1999) (Carnes, J., concurring). Rather, "Title VII requires a baseline of objectively offensive conduct." *Id.* at 1256. To require otherwise would mean that employers could face legal sanctions if their employees ever looked at each other for extended periods of time. *See id.* Here, the record on Robinson's comments, compliments, and looks does not establish objectively pervasive harassment.

Caselaw supports this outcome. In *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355 (10th Cir. 1997), the Tenth Circuit held that the plaintiff had not experienced severe or pervasive harassment when she had five incidents with an employee-turned-supervisor. *Id.* at 1365-66, 1365 n.5. One of the incidents involved the supervisor looking down the female plaintiff's dress while

---

even if her highly generalized second-hand knowledge is considered as part of the totality of the circumstances, it does not change the outcome of this motion.

he was a guest at her wedding and saying "well, you got to get it when you can." *Id.* at 1366. The plaintiff was so embarrassed that she did not tell her husband for a couple weeks. *Id.* Similarly, the Eleventh Circuit found that harassment was not severe or pervasive when there was

> (1) one instance in which [a male supervisor] said to [the female plaintiff] "I'm getting fired up"; (2) one occasion in which [the supervisor] rubbed his hip against [the plaintiff's] hip while touching her shoulder and smiling; (3) two instances in which [the supervisor] made a sniffing sound while looking at [the plaintiff's] groin area and one instance of sniffing without looking at her groin; and (4) <u>[the supervisor's] "constant" following and staring at [the plaintiff] in a "very obvious fashion</u>."

*Mendoza*, 195 F.3d at 1247 (majority opinion) (emphasis added). The Eleventh Circuit held that the constant stares did not elevate the totality of the conduct to a pervasively hostile work environment, in part because the plaintiff never described the supervisor's following or staring as "'stalking' or 'leering' or 'intimidating' or 'threatening.'" *Id.* at 1249.

Similarly, the Court looks to the Tenth Circuit's binding authority in *Morris*. There, the Tenth Circuit affirmed summary judgment for the defendant on a Title VII sexual harassment claim. 666 F.3d at 658. The female plaintiff was a nurse who worked on a hospital's heart surgery team from 2007 to 2008. *Id.* at 658-59. In June 2008, a male doctor hit her on the head twice within a two-week period by "flicking her with his finger without her permission." *Id.* at 658. Then, in August 2008, the plaintiff was assisting the doctor with a pericardiectomy when the doctor removed pericardium tissue and threw it in her direction. *Id.* The tissue hit the plaintiff's leg. *Id.* at 658-59. The plaintiff reported the pericardium incident to her direct supervisor, which led to the doctor being removed from the operating room for a period and a requirement for all heart surgery team members to participate in a team-building program. *Id.* at 659. The doctor and the plaintiff participated in the training and worked together for about three more months. *Id.* Then the plaintiff filed suit against the hospital and was removed from the heart surgery team in December 2008. *Id.*

ADDENDUM007

The Tenth Circuit held that under the totality of the circumstances, the harassment was not sufficiently pervasive to establish liability under Title VII. *Id.* at 665. The plaintiff argued that the harassment must be considered in the context of her allegations that the doctor would also yell at her and demean her work. *Id.* The Tenth Circuit was unpersuaded, however, because "[a] plaintiff does not make a sufficient showing of a pervasively hostile work environment 'by demonstrating a few isolated incidents of . . . sporadic . . . slurs . . . . Instead, there must be a steady barrage of opprobrious . . . comments.'" *Id.* at 666 (omissions in original) (citation omitted). Furthermore, the Tenth Circuit held that the isolated incidents in that case could not be deemed severe. *Id.* In contrast to cases that involved instances of sexual assault, the doctor's behavior did not objectively alter the terms and conditions of the plaintiff's employment. *Id.* at 666-68. In the surgical context, a reasonable worker would be unlikely to consider contact with human biological products as threatening or severe. *Id.* at 668.

In contrast, the Tenth Circuit held in *Sanderson v. Wyoming Highway Patrol* that a reasonable jury could find sexual harassment was severe or pervasive when a female police officer was subjected to persistent rumors that she was sexually promiscuous. 976 F.3d 1164, 1177 (10th Cir. 2020). Specifically, over the course of several years (and a promotion to a different division), multiple colleagues had routinely spread rumors that the plaintiff had sex with her colleagues and supervisors and that she used sex to gain favors at work. *Id.* at 1168-70, 1177. These rumors were accompanied with sex-neutral harassment, such as ignoring Plaintiff's greetings and questions and a colleague bringing breakfast for everyone on the team except her. *Id.* at 1169, 1177.

Here, much of Plaintiff's evidence (particularly about looks) is vague. And, regardless, Plaintiff's evidence is weaker than the evidence in *Mendoza*. Robinson was not Plaintiff's supervisor, and there is no evidence that his conduct changed her relationship with her supervisor

ADDENDUM008

or her ability to approach her supervisor about work-related issues. There is also no evidence that Robinson and Plaintiff attended meetings together or performed joint tasks together such that his conduct affected her ability to process information or perform specific job tasks. *See* Doc. 41 at 33 (suggesting there was no business reason for Robinson to talk to Plaintiff). Instead, Plaintiff could close her office door to minimize contact with Robinson. While Plaintiff claims that Robinson made a handful of inappropriate comments, looked her up and down five to seven times, and frequently complimented her and looked at her, there is nothing about these comments or looks that indicate that they raised Plaintiff's working conditions to the level of a pervasively hostile work environment. *Cf., e.g.*, *EEOC v. Mediacom Commc'ns Corp.*, 2021 WL 1011897, at *16 (M.D. Ga. 2021) (holding genuine issue of fact as to pervasiveness where employees all worked in one large room and coworker regularly stared at the plaintiffs <u>and</u> repeatedly stalked them in the parking lot).

Additionally, this case is like *Morris*. Both plaintiffs worked at their relevant positions for a relatively short time. Both women were subjected to inappropriate conduct over the course of a few months. The nurse in *Morris* experienced three instances of battery against the backdrop of being yelled at and demeaned. Here, in the light most favorable to Plaintiff, Robinson made several innuendo-laced comments over a four-month period against the backdrop of seven looks, undescribed frequent looks, and repeated compliments about her clothing. *See* Doc. 41 at 31-32; Doc. 38 at 9-10, ¶ 20. Like *Morris*, this conduct is not objectively severe or pervasive. Finally, this case is not like *Sanderson*. There, the plaintiff was routinely subjected to humiliating rumors by multiple colleagues in multiple divisions of the Wyoming Highway Patrol. The behavior by a single employee in this case pales in comparison. Therefore, Defendant is entitled to summary

ADDENDUM009

judgment on Plaintiff's sexual harassment claim because no reasonable jury could find severe or pervasive harassment.[5]

### 2. No reasonable jury could find that Defendant knew about the sexual harassment and that its response was unreasonable.

Defendant alternatively argues that it is entitled to summary judgment because no reasonable jury could find that it knew about Robinson's sexual harassment and unreasonably responded to it. Doc. 38 at 20-23. Plaintiff counters by arguing that Defendant was negligent in responding to Robinson's harassment of Plaintiff because it had notice of Robinson's past behavior with other employees. Doc. 41 at 34-36. The parties vigorously dispute whether various evidence of Robinson's prior conduct is in a form that would be admissible at trial. For purposes of the motion for summary judgment, the Court assumes without deciding that all disputed evidence about Robinson's prior conduct is admissible.

Unless a harasser is a supervisor, a plaintiff "must show that the [defendant] had actual or constructive notice of the harassment and negligently failed to remedy or prevent it." *Kramer v. Wasatch Cnty. Sheriff's Off.*, 743 F.3d 726, 755 (10th Cir. 2014) (citation omitted). An employer's knowledge that the harasser had harassed other people could show constructive notice. *Id.* at 755-

---

[5] Several other cases support this outcome. *See, e.g.*, *Webb-Edwards v. Orange Cnty. Sheriff's Off.*, 525 F.3d 1013, 1027-28 (11th Cir. 2008) (holding that comments by supervisor that the plaintiff was hot and needed to wear tighter clothes, made weekly over 8-week period, were not severe or pervasive); *Singleton v. Dep't of Corr. Educ.*, 115 F. App'x 119, 120, 123 (4th Cir. 2004) (finding no actionable harassment when the plaintiff complained that her co-worker, among other things, "insistently complimented" her, stared at her breasts when he spoke to her, and "constantly" told her how attractive he found her); *Morris v. Oldham Cnty. Fiscal Ct.*, 201 F.3d 784, 787, 790 (6th Cir. 2000) (finding the plaintiff did not present sufficient evidence to survive summary judgment when the harasser told the plaintiff several inappropriate jokes, made a verbal sexual advance, referred to the plaintiff as "Hot Lips," and made "isolated comments about [her] state of dress"); *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 458-59, 464 (6th Cir. 2000) (concluding no severe or pervasive harassment despite three instances of physically invasive conduct, including a supervisor grabbing the plaintiff's buttocks and saying that "she controlled [the plaintiff's] ass and she would do whatever she wanted with it," coupled with repeated unwanted sexual advances); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995) (finding no actionable harassment where supervisor made at least nine suggestive comments, such as calling the plaintiff "pretty girl," and grunted when she wore a leather skirt over a nine-month period); *Akonji v. Unity Healthcare, Inc.*, 517 F. Supp. 2d 83, 87-88, 97-99 (D.D.C. 2007) (finding no actionable harassment when supervisor touched the plaintiff's buttock and thigh, tried to kiss her, called her beautiful, asked her to accompany him on a weekend trip, and stared at her often).

66 (explaining "dangerous employee" liability theory). But the extent and seriousness of the prior harassment and the similarity and nearness in time to the later harassment are factors in deciding whether to allow the evidence of harassment of others to prove notice. *Id.* at 756. Finally, a plaintiff must show that an employer's remedy was not reasonably calculated to end the harassment to show that the employer's remedy was inadequate. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 676 (10th Cir. 1998).

Plaintiff does not allege that Robinson was her supervisor. Nor does she allege that Defendant had actual notice of her harassment prior to her telling Sorenson in August 2019 that she was going to report Robinson. Human Resources investigated the report the next business day, and Robinson immediately resigned. Thus, no reasonable jury could conclude that Defendant's remedy was not reasonably calculated to end the harassment once it had actual knowledge. *See id.* ("A stoppage of harassment shows effectiveness, which in turn evidences such reasonable calculation."). Therefore, Plaintiff must show that Defendant had constructive notice of her harassment prior to her report to survive summary judgment.

Plaintiff seems to argue that Defendant had constructive notice of Robinson's harassment under the dangerous employee theory. *See* Doc. 41 at 34; *see also Kramer*, 743 F.3d at 755. Examining the extent, seriousness, similarity, and nearness in time of Plaintiff's harassment to the prior harassment, no reasonable jury could hold that Defendant had constructive notice. In the light most favorable to Plaintiff, the record contains the following instances of misbehavior by Robinson: (1) In December 2017, a former nursing director filed a charge with the EEOC against the hospital based on the behavior of its Chief Executive Officer. 42-1 at 1, 4. In the EEOC complaint, she alleged that the Chief Executive Officer and Human Resources had not disciplined Robinson for calling her "babe" in a meeting and telling her on one occasion to wear high heels

more often because they made her look "more sexy." *Id.* at 4. (2) Fast forwarding to September 2018, the Chief Executive Officer and the Human Resources Director met with Robinson to reprimand him for racially insensitive comments he had made. *See* 38-6 at 3, 10-13. They also admonished him for asking colleagues whether new employees were "hot" and for saying a particular doctor could not do her job because she was pregnant. *Id.* at 3. They told him that, going forward, other infractions would be investigated and could include discipline up to and including termination. *Id.* Robinson completed cultural diversity training after the meeting. *Id.* at 5-9. (3) In February 2019, another employee and Robinson got into a dispute where he accused her of opening and/or tampering with his mail, and she accused him of saying that it was a good thing there was nothing inappropriate in the package. *See id.* at 31-43. The parties disputed whether Robinson used the word "dildo" in the conversation. *Id.* at 33. Defendant investigated the dispute. *Id.* at 31-32. The investigation was inconclusive, and neither side could corroborate their story. *See id.* Defendant added notes to both employees' files. *Id.* at 33-36. (4) Finally, in August 2019, two nurses reported that Robinson refused to help "work the floor" when they were shorthanded. *See id.* at 29-30.

The incident that most closely resembles Plaintiff's is the former nursing director's EEOC charge from 2017. This charge was filed before Plaintiff started her job at Defendant and over a year and a half before Plaintiff reported Robinson. Notably, the nursing director's charge was not directed towards Robinson, and she only accused Robinson of making two inappropriate remarks. Plaintiff does not allege that any other employee contributed to a hostile working environment. Doc. 36 at 3 ("[Plaintiff] alleges that she was subject to sexual harassment . . . by Adriel Robinson."). In the end, Plaintiff has not shown harassment incidents that were "so egregious, numerous, and concentrated as to add up to a campaign of harassment" such that Defendant was

ADDENDUM012

on notice of Robinson's behavior before August 2019. *Jackson v. Kan. City Kan. Pub. Sch. Unified Sch. Dist. No. 500*, 799 F. App'x 586, 591 (10th Cir. 2020) (quoting *Baker v. Weyerhaeuser Co.*, 903 F.2d 1342, 1346 (10th Cir. 1990)). Therefore, the Court alternatively holds that Defendant is entitled to summary judgment because no jury could conclude Defendant responded unreasonably to Plaintiff's internal complaint.

### B.     Retaliation

Plaintiff also claims that Defendant violated Title VII by retaliating against her by forcing her out of her job prematurely because she complained about sexual harassment. Doc. 1 at 7. Defendant argues that Plaintiff did not experience an adverse employment action and has failed to establish any causal connection between her employment's end and her protected activity. Doc. 38 at 23, 25. Defendant also argues that Plaintiff has not shown that its reasons for setting a deadline for her departure were a pretext for retaliation. *Id.* at 25; Doc. 47 at 14.

In the absence of direct evidence, a plaintiff must establish a prima facie retaliation case under the *McDonnell Douglas* framework by showing that (1) she engaged in protected opposition to discrimination, (2) a reasonable employee would have found the challenged action materially adverse, and (3) a causal connection exists between the protected activity and the materially adverse action. *Hansen v. SkyWest Airlines*, 844 F.3d 913, 925 (10th Cir. 2016) (citation omitted). "Once the plaintiff successfully asserts a prima facie retaliation case, the burden shifts to the defendant (i.e., employer) to come forward with a legitimate, non-retaliatory rationale for the adverse employment action. If the defendant does so, the plaintiff must show that the defendant's proffered rationale is pretextual." *Id.* (citation omitted).

The parties don't dispute that Plaintiff engaged in protected opposition to discrimination. But they do dispute whether she meets the remaining elements of a prima facie case of retaliation.

ADDENDUM013

Plaintiff frames her adverse employment action as "Sorenson's imposition of [an] accelerated deadline" for Plaintiff to leave her job. Doc. 41 at 40. This framing blurs the context that preceded it—namely, Sorenson presenting Plaintiff with the Last Chance Agreement and Plaintiff telling Sorenson that she was looking for work elsewhere. Thus, there are two potential adverse employment actions: (1) the "Last Chance Agreement" that led to Plaintiff seeking other employment; and (2) Sorenson's imposition of a hard deadline for Plaintiff to leave approximately two weeks after her internal complaint.

Regarding the "Last Chance Agreement," even if the Court were to assume it was an adverse employment action, it could not support a prima facie case of retaliation because Plaintiff cannot show a causal link between the agreement and any protected activity. This is because the "Last Chance Agreement" was imposed before Plaintiff engaged in any protected activity. Therefore, the Court focuses on whether Sorenson giving Plaintiff a September 13 termination date on August 30 was a materially adverse action.

Plaintiff had told Sorenson in July she was looking for a new job and already had a new job lined up on August 30. Doc. 41 at 7, ¶ 16. She argues, however, that the accelerated deadline resulted in her being out of work for one week because her new job did not start until a week after her September 13 termination date. *Id.* at 40; *see also* 41-1 at 135:4-137:7. She further argues that had she not been rushed to find a new job, she could have continued looking for a higher-level job. Doc. 41 at 40-41. Notably, Plaintiff does not argue that she was terminated due to her protected activity, nor does she dispute that she was looking for other work and put in her notice after finding a new position. Rather, she only claims that her departure was "hurried." *Id.* at 40.

An adverse employment action is a "significant change in employment status, . . . or a decision causing a significant change in benefits." *Daniels v. United Parcel Serv., Inc.*, 701 F.3d

ADDENDUM014

620, 635 (10th Cir. 2012) (citation omitted). It is an objective inquiry and not based on a plaintiff's personal feelings. *Id.* at 638. Plaintiff tries to manufacture an adverse employment action by arguing that Defendant's deadline caused her to lose one week's pay. Doc. 41 at 40. Plaintiff points to no evidence in the record to support her argument that she lost a week's pay <u>because of</u> Defendant's deadline. Plaintiff merely directs the Court to her deposition testimony, which indicates that Plaintiff wanted to give a full two weeks' notice. Doc. 41-1 at 137:3-7. Thus, she had to wait an additional week to start her new job, so she could start on a payroll Monday. *Id.* at 134:21-137:2. Plaintiff concedes that she was not required to give a two weeks' notice before leaving Defendant's employ. Doc. 41 at 7, ¶ 17. Furthermore, her speculation that she could have looked for better work had she not been rushed is insufficient to survive a summary-judgment motion. *See, e.g.*, *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) ("To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise.").[6] Thus, Plaintiff fails to make a prima facie retaliation case because she did not suffer an adverse employment action when Defendant changed her indefinite departure date to a date certain.

Furthermore, even if Plaintiff had presented a prima facie case, her retaliation claim still fails. Once Plaintiff had established a prima facie case, the burden would shift to Defendant to articulate a legitimate rationale for giving Plaintiff a termination date. Defendant believed that Plaintiff was struggling with her job and knew she was looking for other work. Doc. 47 at 13. Defendant did not want to keep her on indefinitely. *Id.* Sorenson believed that Plaintiff's role was a key one, and that she needed to fill the position. *Id.*; *see also* 41-5 at 53:19-55:18. Replacing a

---

[6]  Plaintiff's argument that she was rushed is also somewhat speculative. The parties do not dispute that by July, at the latest, Plaintiff had informed Sorenson that she was looking for other jobs.

ADDENDUM015

struggling employee who wants to leave with a competent employee who wants to stay is a non-discriminatory rationale for giving Plaintiff a date certain to find new employment. Therefore, the burden shifts back to Plaintiff to articulate why Defendant's deadline was pretext for retaliation.

A plaintiff "can establish pretext by showing weaknesses, contradictions, or inconsistencies in [a defendant's] reason[ing] such that a reasonable jury could find [it] unworthy of belief." *Edmonds-Radford v. Sw. Airlines Co.*, 17 F.4th 975, 991 (10th Cir. 2021). In examining pretext, it does not matter if a defendant's reasoning was correct. *Id.* The Court cannot second-guess a defendant's business judgment. *Id.*

Here, Plaintiff argues that because Sorensen told Plaintiff that "corporate was putting pressure on her" when she gave Plaintiff the deadline to find other employment, and Defendant has not provided facts as to why corporate was putting pressure on Sorenson, that suggests Defendant's reason for the deadline was pretext. Doc. 41 at 41. Plaintiff misunderstands her burden. Defendant has articulated a legitimate reason for the deadline. It is <u>Plaintiff's</u> burden to show why that deadline was a pretext for retaliation, not just demand more explanation. *See, e.g.*, *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) ("[M]ere conjecture that [the] employer's explanation is a pretext . . . is an insufficient basis for denial of summary judgment." (first two alterations in original) (citation omitted)).

Admittedly, Plaintiff's retaliation argument is not clear. Plaintiff seems to rest her claim entirely on the temporal proximity between her internal complaint about Robinson and getting her deadline from Sorenson. *See* Doc. 41 at 39. In *Morgan*, the Tenth Circuit held that the plaintiff had not shown that her reason for termination was a pretext for retaliation. 108 F.3d at 1324-25. There, the plaintiff received a written warning about her chronic absenteeism in May. *Id.* at 1322. The plaintiff filed a charge with the EEOC in August. *Id.* The plaintiff received another written warning

ADDENDUM016

in October. *Id.* The absenteeism continued, and the plaintiff was terminated the following January. *See id.* The Tenth Circuit reasoned that, given that the plaintiff had been warned about her absenteeism both before and after she filed the EEOC charge, the timing of plaintiff's termination "simply completed the disciplinary process already set in motion" and did not support an inference of pretext. *Id.* at 1324.

The same rationale applies here. Plaintiff's departure was set in motion long before she engaged in protected activity. Sorenson gave Plaintiff the Last Chance Agreement <u>months</u> before Plaintiff spoke to her about Robinson. Plaintiff had informed Sorenson that she was looking for another job <u>before</u> she filed her harassment report. And when Plaintiff told Sorenson that she was going to report Robinson, Sorenson <u>encouraged</u> Plaintiff to do so. Under the undisputed facts, there is nothing that a reasonable factfinder could rely on to call into question the stated reason for giving Plaintiff a deadline to find other employment. Therefore, Defendant is entitled to summary judgment on Plaintiff's retaliation claim.[7]

## IV.   CONCLUSION

The Court finds that Defendant is entitled to summary judgment on both claims.

THE COURT THEREFORE ORDERS that Defendant's Motion for Summary Judgment (Doc. 37) is GRANTED.

THE COURT FUTHER ORDERS that Plaintiff's Motion for Leave to File Supplemental Legal Memorandum (Doc. 48) is DENIED.

IT IS SO ORDERED.

Dated: February 17, 2022            /s/  *Holly L. Teeter*
                                    HOLLY L. TEETER
                                    UNITED STATES DISTRICT JUDGE

---

[7]   Because the Court finds for Defendant on Plaintiff's retaliation claim, it need not address Defendant's causation argument.

# United States District Court

## ------------------------- DISTRICT OF KANSAS----------------------------

| | |
|---|---|
| TRACIE FRANK, | |
| **Plaintiff,** | |
| **v.** | Case No. 2:20-cv-02496-HLT |
| HEARTLAND REHABILITATION HOSPITAL, LLC, | |
| **Defendant.** | |

## JUDGMENT IN A CIVIL CASE

☐   Jury Verdict.   This action came before the Court for a jury trial.  The issues have been tried and the jury has rendered its verdict.

☒   Decision by the Court.  This action came before the Court.  The issues have been considered and a decision has been rendered.

Pursuant to the Memorandum and Order (Doc. 52), judgment is entered in favor of Defendant Heartland Rehabilitation Hospital, LLC. This case is closed.

IT IS SO ORDERED.

SKYLER O'HARA
CLERK OF THE COURT

Dated: February 17, 2022          */s/  Misty Deaton*
                                  By Deputy Clerk